Slip-Op. 07-130

UNITED STATES COURT OF INTERNATIONAL TRADE

—————————————————————— :
NEVINNOMYSSKIY AZOT, *et al.*,                  :
                                                :
            Plaintiffs,                         :
                                                :
      v.                                        :
                                                :
UNITED STATES,                                  :
                                                :    Before: Judith M. Barzilay, Judge
            Defendant,                          :    Court No. 06-00013
                                                :    **Public Version**
      and                                       :
                                                :
AGRIUM US, INC. & AD HOC                        :
COMMITTEE OF DOMESTIC                           :
NITROGEN PRODUCERS,                             :
                                                :
            Defendant-Intervenors.              :
—————————————————————— :


OPINION

[Plaintiffs' motion for judgment on the agency record is granted in part and denied in part. Second Sunset Review remanded to ITC.]

*White & Case, LLP* (*Jay C. Campbell*), *Walter J. Spak*, (*Scott S. Linciome*), (*Frank H. Morgan*), for Plaintiffs Nevinnomysskiy Azot, Novomoskovsk Azot JSC, JSC MCC Eurochem, Kuybyshevazot JSC, JSC "Azot" Berezniki, and JSC "Azot" Kemerovo.

(*Michael K. Haldenstein*), (*James M. Lyons*), (*Neal J. Reynolds*), *Andrea C. Casson*, Office of the General Counsel, United States International Trade Commission for Defendant United States.

*Joel R. Junker & Associates* (*Joel R. Junker*) for Defendant-Intervenor Agrium US, Inc.

*Akin, Gump, Strauss, Hauer & Feld, LLP* (*Lisa W. Ross*), (*Valerie A. Slater*), *Margaret C. March* for Defendant-Intervenor Ad Hoc Committee of Domestic Nitrogen Producers.

Dated: August 28, 2007

**Court No. 06-00013**                                                      **Page 2**

**BARZILAY, JUDGE:**

Plaintiffs Nevinnomysskiy Azot, Novomoskovsk Azot JSC, JSC MCC Eurochem,

Kuybyshevazot JSC, JSC "Azot" Berezniki, and JSC "Azot" Kemerovo (collectively "Plaintiffs"

or "Russian Respondents") move pursuant to USCIT Rule 56.2 for judgment upon the agency

record, requesting the court to remand the United States International Trade Commission's

("ITC") second sunset review determination.  In an evenly divided vote,[1] the ITC Commissioners

determined that revocation of antidumping duty ("AD") orders on solid urea[2] imports from

Russia and Ukraine ("subject imports") likely would cause material injury to the U.S. industry

within a reasonably foreseeable time.  *Solid Urea from Russia and Ukraine*, 70 Fed. Reg. 74,846

(USITC Dec. 16, 2005); *accord Solid Urea from Russia and Ukraine*, Inv. Nos. 731-TA-340

E&H (Second Review), Pub. 3821 (Dec. 2005) ("*Second Review*").  In effect, this determination

left the 20 year-old orders on the subject imports in place.  For the reasons given below,

Plaintiffs' motion is granted in part and denied in part.

---

[1]An evenly divided vote among ITC Commissioners constitutes an affirmative decision
pursuant to 19 U.S.C. § 1677(11).

[2]
> Solid urea is a high-nitrogen-content fertilizer that is produced by reacting
> ammonia with carbon dioxide.  It is sold in both prilled and granular form.  Solid
> urea has many uses, primarily as a fertilizer, but also for industrial applications,
> including urea-formaldehyde resins used in the adhesives industry (plywood and
> particle board); molding powders; varnishes and foams; and for impregnating
> paper, textiles, and leather.  Solid urea is also used extensively as a synthetic
> protein supplement for ruminant animals where tiny microprills are commonly
> incorporated uniformly into animal feeds.

*Solid Urea from Russia and Ukraine*, Inv. Nos. 731-TA-340 E&H (Second Review), Pub. 3821
(Dec. 2005) at 5 (footnote omitted).  Although chemically identical, granular and prilled differ
slightly in shape and size due to their respective production processes.  *See id.* at 6, 16.

**Court No. 06-00013**                                                        **Page 3**

## II. Procedural History

On July 16, 1986, domestic producers of solid urea filed a petition with the Department

of Commerce ("Commerce") and the ITC, alleging that dumped imports of solid urea from the

Union of Soviet Socialist Republics ("USSR"), the German Democratic Republic ("GDR"), and

Romania were materially injuring the U.S. industry.  *Staff Report to the Commission on Inv. Nos.*

*731-TA-340 E&H (Second Review)* (Oct. 28, 2005) ("*Staff Report*") at I-2.  On July 14, 1987,

Commerce imposed AD orders on solid urea imports from those countries after it determined that

the subject imports were being sold in the United States at less than fair value, and the ITC

determined that the dumped imports were materially injuring the U.S. urea industry.

*Antidumping Duty Order; Urea from the Union of Soviet Socialist Republics*, 52 Fed. Reg.

26,367 (Dep't Commerce July 14, 1987); *Antidumping Duty Order; Urea from the Socialist*

*Republic of Romania*, 52 Fed. Reg. 26,367 (Dep't Commerce July 14, 1987); *Antidumping Duty*

*Order; Urea from the German Democratic Republic*, 52 Fed. Reg. 26,366 (Dep't Commerce July

14, 1987).  After the collapse of the USSR, Commerce divided the original AD order into fifteen

orders applicable to each independent state of the former Soviet Union.  *Solid Urea from the*

*Union of Soviet Socialist Republics; Transfer of the Antidumping Duty Order on Solid Urea from*

*the Union of Soviet Socialist Republics to the Commonwealth of Independent States and the*

*Baltic States and Opportunity to Comment*, 57 Fed. Reg. 28,828 (Dep't Commerce June 29,

1992).  On April 3, 1998, Commerce revoked the AD order on imports from the former GDR

after a changed circumstances review.  *Solid Urea from the Former German Democratic*

*Republic: Final Results (Revocation of Order) of Changed Circumstances Antidumping Duty*

*Review*, 63 Fed. Reg. 16,471 (Dep't Commerce Apr. 3, 1998).

The ITC instituted the first sunset reviews of the remaining orders on March 1, 1999.

*Solid Urea from Romania, Armenia, Azerbaijan, Belarus, Estonia, Georgia, Kazakhstan,*

*Kyrgyzstan, Latvia, Lithuania, Moldova, Russia, Tajikistan, Turkmenistan, Ukraine, and*

*Uzbekistan*, 64 Fed. Reg. 10,020 (USITC Mar. 1, 1999).  After completing its investigation, the

ITC determined that revocation of the AD orders on solid urea imports from Romania and the

remaining independent states of the former Soviet Union, except Armenia, would materially

injure the U.S. urea industry in a reasonably foreseeable time.  *Solid Urea from Armenia,*

*Belarus, Estonia, Lithuania, Romania, Russia, Tajikistan, Turkmenistan, Ukraine, and*

*Uzbekistan*, 64 Fed. Reg. 60,225 (USITC Nov. 4, 1999).  Therefore, Commerce revoked the AD

order on Armenia but left the other orders in effect for another five years.  *Revocation of*

*Antidumping Duty Order: Solid Urea from Armenia*, 64 Fed. Reg. 62,654 (Dep't Commerce Nov.

17, 1999); *Continuation of Antidumping Duty Orders: Solid Urea from Belarus, Estonia,*

*Lithuania, Romania, Russia, Tajikistan, Turkmenistan, Ukraine, and Uzbekistan*, 64 Fed. Reg.

62,653 (Dep't Commerce Nov. 17, 1999).

On October 1, 2004, the ITC instituted the second sunset reviews, the results of which are

at issue in this case.  *Solid Urea from Belarus, Estonia, Lithuania, Romania, Russia, Tajikistan,*

*Turkmenistan, Ukraine, and Uzbekistan*, 69 Fed. Reg. 58,957 (USITC Oct. 1, 2004).

Because no domestic interested party participated in the reviews of the orders on Romania and

the remaining independent states of the former Soviet Union, except Russia and Ukraine,

Commerce revoked those orders.[3]  *Solid Urea from Belarus, Estonia, Lithuania, Romania,*

---

[3]Pursuant to 19 U.S.C. § 1675(c)(3)(A), Commerce shall revoke an order or terminate an investigation if no domestic interested party responds to notice of initiation of review.

*Tajikistan, Turkmenistan, and Uzbekistan: Final Results and Revocation of Orders*, 69 Fed. Reg.

77,993 (Dep't Commerce Dec. 29, 2004).   The ITC likewise terminated its reviews of the

revoked orders.  *Solid Urea from Belarus, Estonia, Lithuania, Romania, Tajikistan,*

*Turkmenistan, and Uzbekistan*, 70 Fed. Reg. 2657 (USITC Jan. 14, 2005).   Therefore, only solid

urea imports from Russia and Ukraine remained at issue in the ITC's second sunset reviews.

Domestic interested parties petitioned the ITC to leave the AD orders on the subject

imports from the two countries in effect for another five years.  *See, e.g.*, *Second Review* at 4

n.15.   The ITC then proceeded with a full review[4] of the subject imports after receiving adequate

responses from domestic interested parties[5] and several Russian producers of solid urea.[6]  *Id*. at 5.

No Ukrainian producers of solid urea submitted responses to the ITC.[7]  *Id*.  After completing the

investigation pursuant to 19 U.S.C. § 1675(c), ITC Chairman Pearson along with Commissioners

Koplan and Lane ("the majority") determined that revocation of the orders would cause material

injury to the U.S. industry within a reasonably foreseeable time, while Commissioners Okun,

---

[4]The ITC conducts a full, rather than expedited, review once it finds responses from all
interested parties adequate, or if other circumstances warrant.  *See* 19 C.F.R. § 207.62(c).

[5]The ITC received an adequate joint response from four domestic producers who are
members of Defendant-Intervenor Ad Hoc Committee of Domestic Nitrogen Producers
("AHC"):  CF Industries, Inc.; PCS Nitrogen Fertilizer; Terra Industries, Inc.; and Mississippi
Chemical Corporation.  The ITC also received a separate adequate response from Defendant-
Intervenor Agrium US, Inc.  *Second Review* at 5.

[6]The ITC received adequate responses from Nevinnomysskiy Azot; Novomoskovsk Azot
JSC; Kuybyshevazot JSC; Salavatnefteorgsintez OJSC; Kemerovo OJSC "Azot"; OJSC Tolyatti
Azot; Azot OJSC, Berezniki; and MCC EuroChem.  *Second Review* at 5.

[7]The ITC "determined to conduct full reviews of both orders in order to promote
administrative efficiency in light of its decision to conduct a full review with respect to the order
on subject imports from Russia."  *Second Review* at 5.

**Court No. 06-00013**                                                                    **Page 6**

Hillman, and Aranoff ("the dissent") disagreed.  *Solid Urea from Russia and Ukraine*, 70 Fed.

Reg. 74,846; *Second Review* at 3 n.1.  Therefore, Commerce left the orders on the subject

imports in effect.  *See Notice of Continuation of Antidumping Duty Orders:  Solid Urea from the*

*Russian Federation and Ukraine*, 71 Fed. Reg. 581 (Dep't Commerce Jan. 5, 2006).  Plaintiffs

brought suit in this Court to challenge the ITC's determination.

### III. Statutory Background

Congress requires that Commerce and the ITC conduct sunset reviews every five years

after the initial publication of an AD order.  19 U.S.C. § 1675(c).  In a sunset review proceeding,

Commerce must revoke an AD order unless it determines "that dumping . . . would be likely to

continue or recur," and the ITC determines "that material injury [to the domestic industry] would

be likely to continue or recur."  § 1675(d)(2).  In making its determination, the ITC must

"consider the likely volume, price effect, and impact of imports of the subject merchandise on the

[domestic] industry if the order is revoked . . . ."  *Id*. § 1675a(a)(1).  The ITC must

> take into account – (A) its prior injury determinations, including the volume, price
> effect, and impact of imports of the subject merchandise on the industry before the
> order was issued . . . , (B) whether any improvement in the state of the industry is
> related to the order . . . , (C) whether the industry is vulnerable to material injury if
> the order is revoked . . . , and (D) in an antidumping proceeding under section
> 1675(c) of this title, the findings of the administering authority [Commerce]
> regarding duty absorption under section 1675(a)(4) of this title.

*Id*.

Specifically, to evaluate the likely volume of subject imports, the ITC

consider[s] whether the likely volume . . . would be significant[8] . . . either in
absolute terms or relative to production or consumption in the United States.  In
doing so, the Commission shall consider all relevant economic factors, including
– (A) any likely increase in production capacity or existing unused production
capacity in the exporting country, (B) existing inventories of the subject
merchandise, or likely increases in inventories, (C) the existence of barriers to the
importation of such merchandise into countries other than the United States, and
(D) the potential for product-shifting if production facilities in the foreign country,
which can be used to produce the subject merchandise, are currently being used to
produce other products.

§ 1675a(a)(2).

When evaluating the likely price effects of subject imports, the ITC

consider[s] whether – (A) there is likely to be significant price underselling by
imports of the subject merchandise as compared to domestic like products, and
(B) imports of the subject merchandise are likely to enter the United States at
prices that otherwise would have a significant depressing or suppressing effect on
the price of domestic like products.

§ 1675a(a)(3).  The ITC "may rely on circumstantial, as well as direct, evidence of the adverse

effects of unfairly traded imports on domestic prices."  Statement of Administrative Action, H.R.

Rep. No. 103-316, at 886 (1994), *as reprinted in* 1994 U.S.C.C.A.N. 4040, 4211.

Finally, to evaluate the likely impact of subject imports, the ITC must

consider all relevant economic factors which are likely to have a bearing on the
state of the industry in the United States, including, but not limited to  – (A) likely
declines in output, sales, market share, profits, productivity, return on
investments, and utilization of capacity, (B) likely negative effects on cash flow,
inventories, employment, wages, growth, ability to raise capital, and investment,
and (C) likely negative effects on the existing development and production efforts
of the industry, including efforts to develop a derivative or more advanced version
of the domestic like product

---

[8]"'Significant' is defined as 'having or likely to have influence or effect[;] deserving to be
considered[;] important, weighty, notable[.]'"  *Gerald Metals, Inc. v. United States*, 22 CIT 1009,
1013, 27 F. Supp. 2d 1351, 1355 (1998) (brackets in original) (citation omitted).

– all "within the context of the business cycle and the conditions of competition that are

distinctive to the affected industry."  § 1675a(a)(4).

While the ITC must consider all of the factors enumerated in the statute, no one factor is

necessarily dispositive.

> The presence or absence of any factor which the Commission is required to
> consider under this subsection [§ 1675a(a)] shall not necessarily give decisive
> guidance with respect to the Commission's determination of whether material
> injury is likely[9] to continue or recur within a reasonably foreseeable time[10] if the
> order is revoked . . . . In making that determination, the Commission shall
> consider that the effects of revocation or termination may not be imminent, but
> may manifest themselves only over a longer period of time.

§ 1675a(a)(5); *accord* 1994 U.S.C.C.A.N. at 4211.

### IV. Jurisdiction & Standard of Review

This Court has "exclusive jurisdiction of any civil action commenced under" 19 U.S.C.

§ 1516a to review an ITC's sunset review determination.  28 U.S.C. § 1581(c).  The court will

uphold the ITC's determination unless it is "unsupported by substantial evidence on the record, or

otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  "Substantial evidence is

more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion."  *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229, 59

S. Ct. 206, 217 (1938).

---

[9]The term "likely" typically means "probable," not merely "possible."  *Usinor v. United States*, 26 CIT 767, 794 (2002) (not reported in F. Supp.) (quotations omitted).  Under the likelihood standard, the ITC "engage[s] in a counter-factual analysis:  it must decide the likely impact in the reasonably foreseeable future of an important change in the status quo."  1994 U.S.C.C.A.N. at 4209.

[10]The term "'reasonably foreseeable time' will vary from case-to-case, but normally will exceed the 'imminent' timeframe application in a threat of injury analysis."  1994 U.S.C.C.A.N. at 4211.

In a material injury determination, the ITC should take "into account the entire record, including whatever fairly detracts from the substantiality of the evidence." *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).  However, the fact that plaintiffs "can point to evidence of record which detracts from the evidence which supports the Commission's decision and can hypothesize a reasonable basis for a contrary determination is neither surprising nor persuasive." *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 936 (Fed. Cir. 1984).  "[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620, 86 S. Ct. 1018, 1026 (1966) (citing *NLRB v. Nev. Consol. Copper Corp.*, 316 U.S. 105, 106, 62 S. Ct. 960, 961 (1942); *Keele Hair & Scalp Specialists, Inc. v. FTC*, 275 F.2d 18, 21 (5th Cir. 1960)).  When "the totality of the evidence does not illuminate a black-and-white answer," it is the role of the ITC as the "expert factfinder" to decide which side is most likely accurate. *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1359 (Fed. Cir. 2006).  Therefore, the court will not "displace" an agency's "choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S. Ct. 456, 465 (1951).

Factual determinations of the ITC are "presumed to be correct," and "[t]he burden of proving otherwise shall rest upon the party challenging such decision" in this Court.  28 U.S.C. § 2639(a)(1).  Furthermore, "'[t]he ITC is not required to explicitly address every piece of evidence presented by the parties, and absent a showing to the contrary, the ITC is presumed to have considered all of the evidence on the record.'" *Nucor Corp. v. United States*, 28 CIT__, __,

318 F. Supp. 2d 1207, 1247 (2004) (quoting *USEC, Inc. v. United States*, 34 F. App'x. 725,

730-31 (Fed. Cir. 2002)) (brackets in original), *aff'd*, 414 F.3d 1331 (Fed. Cir. 2005); *accord*

*Torrington Co. v. United States*, 16 CIT 220, 224, 790 F. Supp. 1161, 1167-68 (1992), *aff'd*, 991

F.2d 809 (Fed. Cir. 1993).  "A court may 'uphold [an agency's] decision of less than ideal clarity

if the agency's path may reasonably be discerned.'"  *Ceramica Regiomontana, S.A. v. United*

*States*, 810 F.2d 1137, 1139 (Fed. Cir. 1987) (quoting *Bowman Transp., Inc. v. Ark.-Best Freight*

*Sys., Inc*., 419 U.S. 281, 286, 95 S. Ct. 438, 442 (1974)) (brackets in original).  Nevertheless, the

ITC "must assess, based on currently available evidence and on logical assumptions and

extrapolations flowing from that evidence, the likely effect of revocation of the antidumping

order on the behavior of the importers." *Matsushita*, 750 F.2d at 933.

### V. Likelihood of Reasonable Overlap of Competition

Plaintiffs appeal the ITC's finding that there is likely to be a reasonable overlap of

competition between the subject imports and the domestic like product if Commerce revokes the

AD orders.  Russian Resp'ts' Mem. P. & A. Supp. USCIT R. 56.2 Mot. J. A.R. 26 ("Pls. Mem.").

The ITC cannot conclude that material injury likely would continue or recur due to revocation if

competition between the subject imports and the domestic like product likely would be very

attenuated.  *See Altx, Inc. v. United States*, 26 CIT 709, 713-14 (2002) (not reported in F. Supp.).

More specifically, without fungibility between the subject imports and the domestic like product,

it would be difficult to conclude that material injury likely would continue or recur due to

revocation.  *See, e.g.*, *BIC Corp. v. United States*, 21 CIT 448, 456, 964 F. Supp. 391, 400 (1997)

(citing *G.M. Corp. v. United States*, 17 CIT 697, 711-12, 827 F. Supp. 774, 787-88 (1993))

("[F]ungibility plays a far more important role in the causation context than in either the like

product or cumulation contexts; the more fungible two products are, the more likely underselling

by one will affect the price of the other.").

The ITC generally considers four factors when analyzing the likelihood of a reasonable

overlap of competition:  "(1) the degree of fungibility[11] between products; (2) the presence of

sales or offers to sell in the same geographic markets; (3) the existence of common or similar

channels of distribution; and (4) the simultaneous presence of imports in the market."  *Wieland*

*Werke, AG v. United States*, 13 CIT 561, 563, 718 F. Supp. 50, 52 (1989); *accord Second Review*

at 8 n.45.  No single factor is determinative, and the list is not exhaustive, as the ITC may

consider other conditions of competition.  *See Wieland*, 13 CIT at 563, 718 F. Supp. at 52.  To

support the ITC's finding, there need be only a likelihood of reasonable, not complete, overlap of

competition between the subject imports and the domestic like product.  *See id.* (citing *Florex v.*

*United States*, 13 CIT 28, 38, 705 F. Supp. 582, 592 (1989)).

## A. The ITC's Finding

Before issuing the material injury determination, all six ITC Commissioners concluded

that there likely would exist a reasonable overlap of competition, specifically noting that "the

---

[11]Although the term "fungible" generally denotes a stricter standard of market
interchangability than "substitutable," the ITC and much case law in this area treat the terms as
having identical meanings.  *See, e.g.*, *Siderca, S.A.I.C. v. United States*, 28 CIT __, __, 350 F.
Supp. 2d 1223, 1228 (2004) ("Degree of fungibility refers to the degree to which consumers of
SLP find foreign and domestic SLP substitutable for one another.").  The statutory scheme
suggests that "substitutable" more closely reflects the intent of Congress.  *See, e.g.*, 19 U.S.C.
§ 1677(10) ("The term 'domestic like product' means a product which is like, or in the absence of
like, most similar in chracteristics and uses with, the article subject to an investigation under this
subtitle.") & (25) ("The term 'subject merchandise' means the class or kind of merchandise that is
within the scope of an investigation, a review, . . . an order under this subtitle . . . , or a finding
under the Antidumping Act, 1921.").

subject imports and domestic like product are likely to be sufficiently fungible." *Second Review* at 12. Currently, about three-quarters of the domestic like product is granular urea, and the rest prilled, while the overwhelming majority of the subject imports would be prilled urea. *Id.* at 11-12.[12] The ITC has treated prilled and granular urea as a single like product since the original determination. *Id.* at 6-7. They share most physical characteristics, are chemically identical, and are both used for fertilizer and industrial purposes. The distinction between the two forms is that "[t]he production processes . . . differ in the final processing of molten urea into small solid pellets." *Id.* at 6; *see also Avesta AB v. United States*, 13 CIT 894, 905, 724 F. Supp. 974, 983 (1989), *aff'd*, 914 F.2d 233 (Fed. Cir. 1990).

In these reviews, the ITC noted that some domestic market segmentation has developed between granular and prilled urea. *Second Review* at 11-12. In general, farmers and purchasers prefer granular urea "for use as fertilizer in the United States, [although] substitution can and does occur. Granular urea's particles, which have an irregular surface and uniform size, are better for blending with other fertilizers." *Id.* at 12 (footnotes omitted).[13] However, only a small portion of urea "used as fertilizer in the United States is blended with other fertilizers, limiting the importance of this distinction," as the majority of urea used as fertilizer is directly applied. *Id.*

----

[12][[     ]], and it represented less than [[     ]] percent of Russia's total urea capacity in 2004. *Staff Report* at IV-5, Table IV-3.

[13]The ITC noted that "[[     ]] percent of domestic consumption of prilled urea is used as fertilizer" and that "Russian prilled urea is used as fertilizer" in other countries. *Second Review* at 12.

Referencing purchasers' responses, the ITC concluded that some farmers and purchasers would switch from granular urea to prilled if it were sold at a considerable discount.  *Id.* at 12 n.73, 23 n.184; *see also id.* at 22 (citing *Staff Report* at Table II-1, II-2).  Further, "the subject imports are likely [to] be fungible with at least the prilled portion of the U.S. market, except apparently the pharmaceutical and animal feed markets," which comprise only [[    ]] percent of domestic shipments in 2004, because no Russian or Ukrainian producer manufactures microprilled urea suitable for the animal feed market or formaldehyde-free urea suitable for pharmaceutical use.  *Second Review* at 11-12; *see id.* at 12 n.72; *Staff Report* at Table V-1, V-2. Nonetheless, the ITC acknowledged that "approximately [[    ]] percent of the domestic industry's total production" likely would be unaffected by revocation of the AD orders.  *Second Review* at 12 n.78 (citing Russian Resp'ts' Final Comments 12 (*See* Def.-Intervenor AHC's ("Def.-Int.") App. 17 (CR 136)); AHC's Posthr'g Br. Ex. 12 (*See* Pls. App. 16 (CR 118))).

The ITC also noted the difficulty of evaluating factors other than fungibility since the subject imports have not entered the domestic market since 1987.  *Id.* at 12.  Due to this absence of import data, the ITC cited evidence which further supported its finding of likely overlap of competition, such as the fact that "[i]nternational trading companies offer solid urea from multiple countries, including the subject countries, for sale" and that the ITC "found in the original investigations that domestic and imported urea were directed to the same customers and were frequently commingled in wholesalers' warehouses."  *Id.* at 12-13 (footnotes omitted). Therefore, the ITC reasoned that "it is likely that these trading companies would [again] offer the subject imports for sale" in the U.S. if Commerce revokes the orders.  *Id.* at 13 (footnote omitted).

### B. The ITC's Finding Is Supported by the Record

In their appeal, Plaintiffs assert that any overlap of competition would be limited.  Pls.

Mem. 26.  First, they claim that the ITC ignored evidence of domestic market segmentation

between granular and prilled urea for fertilizer use, a division which, according to Plaintiffs,

renders the subject imports less fungible with the domestic like product because the

overwhelming majority of the subject imports are prilled.  Pls. Mem. 29-31.  Plaintiffs cite to a

few fertilizer distributors that claim some of their customers would not switch from granular to

prilled urea even with a considerable discount.  Pls. Mem. 30 (citing Pls. App. 20 (CR 120) (Pls.

Posthr'g Br. Ex. 12) (Decl. of [[        ]]); Pls. App. 21 (CR 120) (Pls. Posthr'g Br. Ex. 11) (Decl.

of [[    ]]); Pls. App. 22 (CR 68) ([[   ]] Importers' Questionnaire Resp. Part III-B-9); Pls. App. 23

(CR 40) ([[    ]] Questionnaire Resp. Part III-38)).  As already discussed, the ITC acknowledged

evidence of domestic market segmentation and found the two forms of urea sufficiently fungible

despite a degree of market segmentation.  *Second Review* at 11-12; *see, e.g.*, *Staff Report* at I-25

(noting that Plaintiff MCC Eurochem "reported that most of the prilled urea it sells to export

markets are used in fertilizer applications").  That Plaintiffs can cite to some evidence which

detracts from the evidence supporting the ITC's conclusion does not render the ITC's finding of a

likelihood of reasonable overlap of competition unreasonable.  *See Matsushita*, 750 F.2d at 936.

Further, that some farmers and purchasers merely prefer granular urea over prilled does not

render the two forms non-substitutable.[14]

---

[14]"[T]he information suppled [sic] by the Russian Respondents only indicates that
granular urea is *preferred* for use as fertilizer because it is a higher quality product than prilled
urea, not that it is unsuitable."  *Second Review* at 23 n.184 (emphasis added).  In addition, the
preference for granular urea may not be due to quality alone, further undercutting Plaintiffs'
argument.  Another factor which affects purchasing decisions is the low availability of prilled

Plaintiffs also claim that the ITC failed to consider that the subject imports are more likely to displace nonsubject imports than domestic producers' shipments because nonsubject imports serve almost two-thirds of the domestic market.  Pls. Mem. 31-32; *see also Second Review* at 21 n.172.  Specifically, they reason that domestic importers would lack incentive to import urea from Russia and Ukraine because most nonsubject imports "were entered either by U.S. producers or companies affiliated with producers in nonsubject countries."  Pls. Mem. 32; *accord* Pls. Mem. 31-32.  As the record demonstrates, though, many domestic companies affiliated with foreign producers reported that they imported from sources other than their foreign affiliates.  Def-Int. App. 12 (CR 68) ([[       ]] Importers' Questionnaire Resp. Part II-7); Def-Int. App. 14 (CR 36) ([[   ]] Importers' Questionnaire Resp. Part II-7); Def.-Int. App. 15 (CR 95) ([[   ]] Importers' Questionnaire Resp. Part II-7); Def.-Int. App. 16 (CR 46) ([[   ]] Importers' Questionnaire Resp. Part II-7).  Further, the ITC explicitly stated that "given that nonsubject imports serve almost two-thirds of the U.S. market, it may be true that subject imports would undersell and displace nonsubject imports to some extent.  However, this does not preclude the fact that domestic shipments will also likely be displaced." *Second Review* at 21 n.172.

Plaintiffs also claim that the ITC ignored evidence that "some U.S. production is shielded from competition by virtue of the geographic locations of the production facilities."  Pls. Mem. 28.  In particular, they point to shipments by [[       ]], a domestic producer of urea, which

_____

urea in the domestic market.  *See* Def.-Int. App. 9 (CR 118) (AHC's Posthr'g Br. 5).  In fact, availability of supply ranks above quality, but below price, as the principal factor in consumers' purchasing decisions. *Staff Report* at II-13, Table II-1.  In addition, while the *Staff Report* reduced the substitution elasticity estimate due to the shift toward granular urea in the U.S. market, the estimate "is not intended to be a measure of changes in substitutability since the 1995 study." *Id.* at II-24.

operates facilities in [[      ]].  Pls. Mem. 28 (referencing *Second Review* at 41).  However,

[[   ]] did not report that it would be shielded from import competition; to the contrary, it

indicated that revocation of the orders would result in "[[     ]]."  Def.-Int. App. 5 (CR 38) ([[     ]]

Producer Questionnaire Resp. Part II-16).

Finally, Plaintiffs argue that a much larger share of the U.S. industry's shipments likely

will not face competition because two domestic purchasers, [[       ]] and [[       ]], reported

that "they ***must*** purchase 60 percent and 75 percent, respectively, of their urea from U.S.

producers due to security of supply and delivery cost concerns."  Pls. Mem. 27 (citing *Staff*

*Report* at II-14).  This conclusion mischaracterizes the purchasers' responses regarding their

purchasing decisions.  [[     ]] reported that if Commerce revokes the AD orders, the firm

would become "more active in importation of Russian/Ukrainian urea" and that

"Russian/Ukrainian urea could be used as a new or alternative source" in the total U.S. supply.

Pls. App. 17 (CR 117) ([[      ]] Purchasers' Questionnaire Resp. Part III-38).  Similarly, [[    ]]

reported that revocation of the orders "would increase supply availability to the U.S. market."

Pls. App. 18 (CR 42) ([[       ]] Purchasers' Questionnaire Resp. Part III-38).

Accordingly, the court affirms the ITC's finding of a likely reasonable overlap of

competition between the subject imports and the domestic like product if Commerce revokes the

AD orders.

## VI. Likelihood of Continuation or Recurrence of Material Injury

Plaintiffs challenge the ITC's determination that revocation of the orders would cause the

continuation or recurrence of material injury to the domestic urea industry within a reasonably

foreseeable time.   Following the statutory criteria, the ITC concluded that, if Commerce revokes

the AD orders, the likely volume of the subject imports would be significant, the likely

underselling of the subject imports would have significant adverse price effects on the domestic

urea market, and the subject imports likely would have a significant adverse impact on the

domestic industry. *Second Review* at 21, 23, 27; *see also* § 1675a(a)(1).

### A. Likely Volume of Subject Imports

After taking into account its prior injury determinations and examining the existence of

third-country barriers to the subject imports, and the subject industries' ability and incentive to

divert their exports, the ITC found that the likely volume of the subject imports would be

significant if Commerce revoked the AD orders. *Second Review* at 20-21; *see also* § 1675a(a)(1)

(stating that ITC is required to consider its prior injury determinations in five-year review) & (2)

(stating that to evaluate likely volume of subject imports, ITC may consider all economic factors,

including but not limited to any unused capacity in exporting countries, inventories of subject

merchandise, existence of third-country barriers, and potential for product-shifting).  Plaintiffs

challenge the relevance of the ITC's prior injury determinations and the existence of third-country

barriers in the present case, and the finding that the subject industries have incentive to divert

their exports.

### 1. The ITC's Prior Findings

The ITC turned to its past investigations to support its volume analysis, given the lack of

recent import data.  In the original 1987 investigation, the ITC found that the subject imports

"increased sharply" from 1985 to 1986. *Second Review* at 19 (citing *Urea from the German

Democratic Republic, Romania, and the Union of Soviet Socialist Republics*, Inv. Nos.

731-TA-338-340 (Final), Pub. 1992 (July 1987) ("*Original Determination*") at Table 19).

Likewise, in the first sunset reviews, it found that the likely volume of the subject imports would

be significant if Commerce revoked the AD orders because the subject industries had low

capacity utilization rates and exported the overwhelming majority of their shipments, and

because China had just ceased importing urea, "leaving the United States as one of the largest

remaining export markets" to which the subject industries would divert a large volume of their

exports. *Id.* at 20; *accord id.* at 19-20 (citing *Solid Urea from Armenia, Belarus, Estonia,*

*Lithuania, Romania, Russia, Tajikistan, Turkmenistan, Ukraine, and Uzbekistan*, Inv. Nos.

731-TA-339 & 340-A-I (Review) Pub. 3248 (Oct. 1999) ("*First Review*") at 18-19).  Although

the ITC does not draw explicit conclusions, it implies that, based on this historical background,

the likely volume of the subject imports would be significant again if Commerce revokes the

orders.

      Plaintiffs argue that the ITC's prior injury determinations have little contemporary

relevance due to the domestic market's increasing segmentation between granular and prilled

urea.  However, as discussed *supra*, the two forms of urea are sufficiently substitutable, rendering

Plaintiffs' argument unsupported by the record.

### 2. Third-Country Barriers

      The ITC also cited the existence of third-country barriers to support its volume analysis.

*Id.* at 20.  China ceased importing urea in 1998; Mexico imposed antidumping measures on

Ukrainian exports in 2003; and the European Union ("EU") imposed antidumping measures on

Russian imports in 1995 and Ukrainian imports in 2002.  *Id.*; *Staff Report* at IV-10, IV-13.

Although the ITC does not elaborate, it seems to imply that the mere presence of these third-

country barriers would cause a likely increase in the volume of the subject imports if Commerce

**Court No. 06-00013**                                                                                    **Page 19**

revokes the orders.

Plaintiffs argue that the presence of third-country barriers does not support the ITC's

volume analysis because the global market has adjusted to the presence of the cited barriers, and

therefore, absent other factors, trading companies would have no reason to divert a significant

volume of the subject imports from these countries to the U.S. if Commerce revokes the orders.

Pls. Mem. 14-15.

Ample case law teaches that in the context of sunset reviews, the ITC examines "'the

existence of barriers to the importation of [the subject] merchandise into countries other than the

United States'" to determine whether they "may encourage product-shifting" of the subject

merchandise to the domestic market.  Relevant barriers need not be limited to antidumping

measures.  *Siderca S.A.I.C. v. United States*, 29 CIT __, __, 391 F. Supp. 2d 1353, 1367-68

(2005) (quoting 19 U.S.C. § 1675a(a)(2)(c)), *appeal dismissed*, 167 F. App'x 178 (Fed. Cir.

2006); *see Comm. for Fair Beam Imps. v. United States*, 31 CIT __, __, 477 F. Supp. 2d 1313,

1317 (2007). "[H]igh tariffs and non-tariff barriers" may also prove relevant to the volume

analysis.  *Siderca, S.A.I.C. v. United States*, 28 CIT __, __, 350 F. Supp. 2d 1223, 1235 (2004).

Though the ITC has presented evidence of the presence third-country barriers to the

subject imports, some of the cited barriers lead to an ambiguous conclusion.  Crucially, Russian

exports to the EU have rapidly increased despite the EU's measures.  *Second Review* at 9 n.49

(citing *Staff Report* at IV-10), 20-21.  That the EU's measures have not significantly dampened

Plaintiffs' access to one of the world's largest markets erodes their significance with respect to the

the ITC's volume analysis.  From the record, it would seem that the EU's measures bear relevance

only to the degree that some unpredictable market changes in the EU might, at some point, lead

the subject industries to divert their exports to the United States. *See, e.g.*, *Second Review* at 20

(noting that ITC has interpreted third-country barriers relevant when other export markets, such

as a China, would no longer absorb additional exports, and thus cause likely diversion of subject

imports to United States). EU domestic prices, though, would have to fall substantially for the

EU's antidumping measures to significantly displace Russian exports and thereby catalyze such a

market disruption. *See Staff Report* at IV-10 (noting that "[i]f European prices were to fall again,

the antidumping measures could once again be a barrier to Russian exports of urea. However,

[EU] prices would have to fall substantially to reach the minimum price and to [transform] this

provision [into an effective blockade against Russian imports]." (footnote omitted)). The record

evidence does not reveal the likelihood of any such event occurring. Because of this deficiency,

the court remands this section for further analysis. *See Bando Chem. Indus., Ltd. v. United

States*, 16 CIT 133, 136, 787 F. Supp. 224, 227 (1992) (holding that ITC must make "'rational

connection between the facts found and the choice made'" (quoting *Bowman*, 419 U.S. at 285, 95

S. Ct. at 441)).

### 3. Incentive to Divert Exports

To further bolster its volume finding, the ITC found that the subject industries would

have incentive[15] to divert their exports to the U.S. for three reasons. First, the subject industries

are "highly export oriented." *Second Review* at 20.[16] Second, the ITC found that Russian

---

[15]The ITC also found, and Plaintiffs do not contest, that the subject industries have the
ability to divert rapidly a significant volume of their exports from foreign markets to the
domestic market if Commerce revokes the orders. *Second Review* at 21 & n.167.

[16]Plaintiffs reason that, while the ITC has an established practice of examining whether
the subject industries are export oriented, this fact has little relevance in the present case because
the overwhelming majority of the subject imports would be prilled, while there is an increasing

exporters already have shown interest in selling in the United States if domestic urea prices

exceed those in other markets and that U.S. urea prices are relatively higher than those in other

markets.  *Id.* at 21 (citing AHC's Posthr'g Br. Ex. 16; AHC's Posthr'g Br. Ex. 22).  Finally, the

ITC concluded that the subject industries would have incentive to divert exports to the United

States due to a projected future global oversupply of solid urea and the U.S. market's status as

"the largest importer in the world of solid urea."  *Id.*; *see also id.* at 19 n.144 (noting that two

leading industry experts which follow global urea trends forecast oversupply of urea in near

future as global urea capacity outpaces consumption).

### a. Pricing Analyses

Plaintiffs argue that the ITC erroneously concluded that the subject industries will have

incentive to divert exports to the domestic market because it inappropriately relied on AHC's two

analyses which demonstrate that U.S. prilled urea prices, net transportation costs and duties, are

higher than prilled urea prices in Brazil and at Black Sea ports.[17]  Pls. Mem. 18; Pls. Reply Br. 9.

While the AHC's nine-month comparison between U.S. and Brazilian prices is not an ideal piece

of evidence, as the period of review spanned five years, Plaintiffs had ample time at the

administrative level to submit evidence demonstrating that U.S. prices may be lower than

Brazilian prices, but failed to do so.  The court therefore does not find the ITC's reliance on the

AHC's comparison unreasonable, given that the ITC based its conclusion on currently available

information in the record.  *See Matsushita*, 750 F.2d at 933; *Second Review* at 21.  Likewise, the

---

preference for granular urea in the domestic market.  Pls. Mem. 14-16.  As discussed above in
Section V, this argument fails because granular and prilled urea are sufficiently substitutable.

[17]Brazil is the "largest export market" for the subject imports, and the Black Sea ports are
the "principal shipping points" for the subject imports.  *Second Review* at 21.

**Court No. 06-00013**                                                                                    **Page 22**

court finds that the ITC reasonably relied on the AHC's analysis of U.S. and Black Sea port

prices, given that the evidence as a whole supports the ITC's conclusion and that the ITC

Commissioners asked the AHC for more information about its analysis and heard testimony

concerning the credibility of the evidence.  *See NLRB v. Link-Belt Co.*, 311 U.S. 584, 597, 61 S.

Ct. 358, 365 (1941) (holding that specialized federal agency has power to appraise credibility of

evidence and testimony in establishing factual findings); Def.-Int. App. 9 (CR 118) (AHC's

Posthr'g Br. Ex. 16); Def.-Int. Pub. App. 1 (PR 155) (Tr. 48-51, 107-08, 165-67, 181-82, 188-

89).

### b. Global Urea Oversupply

Plaintiffs also challenge the ITC's conclusion that the subject industries will have

incentive to divert exports to the domestic market due to a forecast global oversupply of urea on

two grounds:  (1) that the ITC relied on flawed evidence to support its global oversupply

projection, and (2) that the ITC failed to account for evidence which undermined its finding.

Plaintiffs attempt to undermine the credibility of industry reports from two expert studies

which forecast global oversupply.  Plaintiffs claim that the ITC failed to take into account that

one study's projections of future global oversupply assumed no production facility closures, even

though plant closures and delays have occurred worldwide and may continue, thereby possibly

causing disruption in future supply.  Pls. Mem. 23-24.  However, a review investigation is

"inherently predictive," and Plaintiffs present no substantial evidence, except for an alternative

view, that undermines the credibility of the study's data.  *See Matsushita*, 750 F.2d at 933.  With

respect to the second study's reports,[18] Plaintiffs claim that the data is flawed because it contains

nothing "to enable a reader to determine" how the study arrived at its conclusions.  Pls. Mem. 24.

However, the second study included details of [[      ]] which will rapidly expand urea capacity

from 2005 through 2015.  Pls. App. 14 (CR 113) (AHC's Prehr'g Br. Ex. 2, 11-12).  Likewise, it

detailed [[      ]].  Pls. App. 15 (CR 132) (AHC's Oct. 26, 2005 Submission, Attach. 1, 89-93).

The ITC has discretion to rely on particular experts when the evidence is reasonable, and

Plaintiffs presented nothing to compel the court to question the reasonableness of the studies.[19] [20]

---

[18]AHC submitted into the record two reports from [[      ]], one report that AHC
commissioned and a second, non-commissioned report, which it submitted as an attachment to its
Posthearing Brief.

[19]Plaintiffs claim that Chairman Pearson's decision to discount global oversupply
forecasts, due to "the inherent difficulty in predicting urea production capacity levels," renders
the rest of his volume analysis unsupported by substantial evidence.  *Second Review* at 19 n.146;
Pls. Mem. 35.  However, Chairman Pearson's analysis is sustainable, as no one factor is
dispositive in making a volume determination.  *See* § 1675a(a)(2).

[20]Plaintiffs also argue that the ITC's decision to place little weight on the subject
industries' recently high capacity utilization rates, which limit the subject industries' ability to
increase production significantly and thereby increase their volume of exports, contradicts the
Court's reasoning in *Nippon Steel Corp. v. United States*, 27 CIT 1856, 1865 n.22, 301 F. Supp.
2d 1355, 1365 n.22 (2003) (holding that ITC could not properly conclude that impact on
domestic industry would be discernible and adverse because capacity utilization rates would
fluctuate in future "merely because utilization rates have fluctuated in the past"), *rev'd on
grounds other than those upon which Plaintiffs base their argument*, Slip. Op. 60-69, 2007 WL
2119859 (Fed. Cir. Jul. 25, 2007).  Pls. Mem. 33.  However, unlike in *Nippon Steel*, in the
present case, the ITC did not conclude that the capacity utilization rates would fluctuate in the
future to the extent that the domestic industry would be adversely impacted.  Rather, it merely
gave little weight to recent capacity utilization rates because they were not "consistently high
during the period of review."  *Second Review* at 20.  High capacity utilization rates do not
preclude a finding of likely significant increase in volume because trading companies could
easily divert shipments of the subject imports to the domestic market if Commerce revokes the
AD orders.  *Id.* at 21; *accord Goss Graphic Sys., Inc. v. United States*, 22 CIT 983, 990-91, 33 F.
Supp. 2d 1082, 1090 (1998), *aff'd*, 216 F.3d 1357 (Fed. Cir. 2000); *see also* § 1675a(a)(5).  In
addition, "[t]he trend toward increasing capacity utilization" for the subject industries was
"irregular" during the period of review, and two Russian producers plan to expand their capacity

*See Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378, 109 S. Ct. 1851, 1861 (1989)

(holding that when agency reaches a reasonable decision, it may rely on its own qualified experts,

even if party presents conflicting views of another expert).

The court does not credit  Plaintiffs' argument that the ITC failed to address a statement

by Agrium's CFO Bruce Waterman that the market "would be 'balanced to a little bit tight over

the next few years.'"  Pls. Mem. 22 (quoting Pls. App. 7 (White & Case Tr. of relevant parts of

Mr. Waterman's remarks 13:07-15:18).  Plaintiffs reason that Waterman's conclusion renders the

ITC's reliance on the industry forecasts unsupported by substantial evidence.  Pls. Mem. 22.  The

court, though, finds that Waterman's conclusion neither undermines nor contradicts the ITC's

reliance on the contested forecasts, which indicate that the global supply/demand balance will

remain tight in the next few years, but then will expand into surplus through 2009.  *See Second*

*Review* at 18-19 (citing *Staff Report* at IV-16, Table IV-10); Def.-Int. App. 9 (CR 118) (AHC's

Posthr'g Br. Ex. 8, 8); Def.-Int. App. 9 (CR 118) (AHC's Posthr'g Br. 8)*.*  Further, Plaintiffs

mischaracterize Waterman's comments, which concerned the broader nitrogen fertilizer industry

and not specifically solid urea.  Pls. App. 7 (White & Case Tr. of relevant parts of Mr.

Waterman's remarks 13:07-15:18).

In sum, while the ITC presents a reasonable case that the subject industries have the

ability and incentive to divert their exports to the United States, the court finds the ITC's

discussion of third-country barriers unsupported by the record because the ITC fails to explain

the barriers' relevance, particularly in light of their inability to hinder imports of the subject

---

in the near future.  *Staff Report* at IV-6; *accord id.* at IV-4; *see also Second Review* at 10.  The
court will not disturb the ITC's decision to discount the recent capacity utilization rates.

merchandise.  In addition, the ITC failed to find three statutory factors for accessing the likely

volume of the subject imports if Commerce revokes the orders.  *See Second Review* at 20 (noting

that subject industries' inventories were small and that capacity utilization rates were recently

high); *Staff Report* at IV-6 (noting that subject industries have no potential for product shifting).

It is true that the ITC is not limited to the consideration of the four delineated factors, *see*

§ 1675a(a)(2), and it is thus permissible for the ITC to place more emphasis on some economic

factors than others because its "decision does not depend on the 'weight' of the evidence, but

rather on the expert judgment of the Commission based on the evidence of record."  *Matsushita*,

750 F.2d at 933 (footnote omitted).  Nevertheless, because the court is not convinced by the

ITC's current explanation of third-country barriers, as it is not supported by substantial evidence

on the record, the court remands the ITC's finding on the likely volume of the subject imports for

further clarification.

## B. Likely Price Effects

After taking into account its past investigations, examining the likelihood of the subject

imports underselling the domestic like product, and determining whether such underselling

would, in turn, depress U.S. urea prices, the ITC found that the subject imports likely would have

significant adverse price effects on the domestic like product.  *Second Review* at 22-23; *see also*

§ 1675a(a)(1) & (3).  Plaintiffs challenge these findings.

### 1. The ITC's Prior Findings

In the original 1987 investigation, the ITC found that the subject imports undersold the

domestic like product significantly, causing U.S. urea prices to decline by 41 to 56 percent from

1985 to 1986.  *Second Review* at 22 (citing *Original Determination* at 9).  Likewise, in the first

sunset reviews, the ITC concluded that the subject imports likely would undersell domestic urea

significantly, and thereby cause U.S. urea prices to decline if Commerce revoked the orders,

because consumers generally purchased urea from the lowest priced supplier, and the subject

industries undersold their exports in third-country markets.  *Id.* (citing *First Review* at 20-21).

While the ITC Commissioners do not elaborate on the relevance of these past findings in the

current reviews, their analysis implies that the majority believes that the subject imports likely

would have adverse price effects again on the domestic like product if Commerce revokes the

orders.

### 2. The ITC's Underselling Analysis & Plaintiffs' Claims

In addition to its past determinations, the ITC found the subject imports likely to

undersell the domestic like product if Commerce revokes the orders.  During the period of

review, U.S. urea prices doubled due to sharp increases in domestic natural gas prices because

natural gas, the main raw material used to produce urea, accounts for a substantial portion of

urea's production costs.  *See id*; *Staff Report* at V-1.  In contrast, the subject industries have

access to low-cost natural gas, allowing them to undersell domestic urea and still make a profit.

*Second Review* at 23.  Given this disparity in production costs, the subject imports are likely to

undersell the domestic like product if Commerce revokes the orders.  *Id.*  These effects would

extend beyond the market for prilled urea despite the limited domestic market segmentation

between granular and prilled urea, because some customers will switch from granular urea to

prilled if given a sufficient discount.  *Id.* at 22-23.

Plaintiffs contend that this analysis contradicts the ITC's finding that the likely volume of

subject imports would be significant if Commerce revokes the orders, because underselling

would be a significant "money losing proposition" for the subject industries if their imports

would have to be sold at a discount that would eliminate the U.S. price premium over other

markets; "the subject industries [would have] no incentive to shift sales away from other markets

to the United States."  Pls. Mem. 38, 39.

Plaintiffs' argument misinterprets the ITC's reasoning.  The U.S. price premium over

other markets is based on a comparison of domestic prilled prices with prilled prices in foreign

markets.  *See Second Review* at 21.  Purchasers, though, indicate only that they may need a

discount to be induced to switch *from granular urea to prilled* for use in fertilizer applications.

*See id.* at 23 n.184.  Plaintiffs would not have to discount their product to penetrate the domestic

prilled urea market, which accounts for about one-quarter of the market share.  *Id.* at 11.  In

addition, while underselling may sometimes be a short-term money-losing strategy, significant

underselling is often used "to gain market share, as occurred during the original investigation,"

and presumably would reoccur in the granular portion of the domestic urea market.  *Id.* at 23.

The ITC's findings are therefore consistent and supported by the record.

### 3. Likelihood That Underselling Would Depress U.S. Prices & Plaintiffs' Claims

Further bolstering its price effects analysis, the ITC found that underselling of the subject

imports likely would depress domestic urea prices for two reasons.  First, "most purchases of

solid urea are made on the spot market rather than long term contractual agreements," which

enables the subject imports to easily and immediately compete with a substantial portion of the

domestic market, thus causing domestic urea prices to rapidly decline.  *Id*.  Second, the subject

industries could adversely affect domestic prices, despite market segmentation, because

purchasers could use prilled urea prices as "leverage" against domestic producers "to negotiate

lower [domestic] granular urea prices." *Id.*  This negotiation process would be easily facilitated by publications, such as *Green Markets*, which disseminate pricing information.  *Id.*

Plaintiffs argue that the ITC's finding of likely significant adverse price effects is unsubstantiated because the ITC "failed to account for forecasts " that world prices are to rise above 2004 price levels.  Pls. Mem. 34; *see also Second Review* at 37 & n.40.   However, the mere fact that one study projects world urea prices to remain above 2004 prices does not undermine the ITC's analysis.  *See* Def.'s Conf. App. List 2. Doc. 132 (AHC's Oct. 26, 2005 Submission, Attach. 1, 104).  In fact, the analyst's report projects that [[      ]].  *See*  Def.'s Conf. App. List 2. Doc. 132 (AHC's Oct. 26, 2005 Submission, Attach. 1, 104).  The report also demonstrates that urea from the Former Soviet Union likely would undersell the domestic like product, despite price increases, because urea from its suppliers will remain the lowest priced among world suppliers.  *See* Def.'s Conf. App. List 2. Doc. 132 (AHC's Oct. 26, 2005 Submission, Attach. 1, 104).  [[        ]].  The record evidence cited by Plaintiffs does not provide substantial support for an alternative conclusion.

Nonetheless, the court questions whether underselling by the subject industries likely would cause U.S. urea prices to decline if Commerce revokes the orders when low-priced urea imported from the Middle East and Venezuela has not depressed domestic prices.  *Cf.* Pls. Mem. 20.  Despite the fact that imports from these nonsubject countries accounted for a substantial portion of the overall domestic supply during the period of review and were priced lower than the domestic like product, U.S. urea prices doubled, and the domestic industry enjoyed high profits.  *See Second Review* at 21 n.172 (stating that nonsubject imports account for two-thirds of U.S. urea market), 25-26; *Staff Report* at Table C-2 (demonstrating that nonsubject imports from

Middle East and Venezuela accounted for about 35 percent of domestic imports in 2004); Def.-

Int. App. 9. Ex. 11 (CR 118) (AHC's Posthr'g Br. Ex. 11) (showing freight-on-board prices for

Middle Eastern urea priced only slightly higher than Black Sea export prices); Def.'s Conf. App.

List 2. Doc. 132 (AHC's Oct. 26, 2005 Submission, Attach. 1, 104) (reporting that [[          ]]).

The ITC failed to explain why the subject imports likely would depress U.S. urea prices when the

nonsubject imports, in a parallel scenario, have not done so.  *See also Bratsk Aluminum Smelter*

*v. United States*, 444 F.3d 1369, 1373 (Fed. Cir. 2006) ("'An affirmative injury determination

requires both (1) present material injury and (2) a finding that the material injury is "*by reason*

*of*" the subject imports.'" (quoting *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 719 (Fed.

Cir. 1997)) (emphasis in original)); *id.* at 1375.

> Where commodity products are at issue and fairly traded, price competitive, non-
> subject imports are in the market, the Commission must explain why the
> elimination of subject imports would benefit the domestic industry instead of
> resulting in the non-subject imports' replacement of the subject imports' market
> share without any beneficial impact on domestic producers.

*Id.* at 1373; *cf. id.* at 1374.  Due to the ITC's "total failure to consider or discuss record evidence"

which "provides significant support for an alternative conclusion," the court remands the ITC's

finding for further analysis of whether the subject imports likely would depress U.S. urea

prices.[21]  *See Allegheny Ludlum Corp. v. United States*, 24 CIT 452, 479, 112 F. Supp. 2d 1141,

1165 (2000).  On remand, the ITC must make a "'rational connection between the facts found and

the choice made.'"  *Bando*, 16 CIT at 136, 787 F. Supp. at 227 (quoting *Bowman*, 419 U.S. at

285, 95 S. Ct. at 441).

---

[21]Plaintiffs also contend that the subject industries already sell their urea on the world
market without adversely impacting world prices.  However, Plaintiffs cited no record evidence
to bolster their claim, so their argument is waived.  *See* USCIT R. 86.1.

Court No. 06-00013                                                      Page 30

### C. Likely Impact on the Domestic Industry

After taking into account its prior investigations, the domestic industry's profits, the

effects of natural gas prices on U.S. production, among other economic factors, and considering

the ITC's prior conclusions that the volume of the subject imports likely would be significant and

that the price effects on the domestic like product likely would be adverse, the ITC found that the

subject imports likely would have a significant adverse impact on the domestic industry if

Commerce revokes the AD orders. *Second Review* at 24-27; *see also* § 1675a(a)(1) & (4).

In the original 1987 investigation, the ITC found that the subject imports caused a

significant adverse impact on the domestic industry due to a significant decline in the domestic

industry's profitability from 1985 to 1986, a sudden decline in the domestic industry's capacity

utilization, and a drop in the ratio of operating income to net sales from 1984 to 1986. *Second*

*Review* at 24 (citing *Original Determination* at 9; *Staff Report* at Table I-1). Likewise, in the first

sunset reviews, the ITC concluded that the subject imports likely would have a significant

adverse impact on the domestic industry if Commerce revoked the orders because "the volume

and price effects of the cumulated subject imports would" adversely impact the domestic industry

and likely cause it to lose market share. *Id.* at 25 (citing *First Review* at 22). However, in the

same reviews, the ITC also found that the domestic industry's profits "rebounded" since the

original investigation and that the domestic industry would *not* be vulnerable to material injury

despite recent declines in U.S. urea prices. *Id.* While the ITC again does not explain how these

past findings relate to the current period of review, its discussion implies that the subject imports

likely would adversely impact the domestic industry again if Commerce revokes the orders.

In contrast to the findings in the first sunset reviews, in these reviews, Commissioners

Koplan and Lane of the majority concluded that the domestic industry *would be vulnerable* to

material injury despite its recently high profits, rising domestic urea prices, and increased

productivity – an economic climate more favorable than that portrayed by the ITC in the first

sunset reviews. *Id.* at 25-26. To arrive at this conclusion, the Commissioners noted that

domestic plants closed and that one domestic producer declared bankruptcy due to increases in

natural gas prices, indicating that the U.S. urea industry would be weakened further if Commerce

revokes the orders because the industry is already vulnerable. *Id.* However, the Commissioners

do not explain how they could reach this finding in light of the ITC's conclusion in the first

reviews. Further, they fail to explain how they could find that high natural gas prices have

weakened the industry when the record evidence indicates that profits increased despite plant

closures and that domestic urea prices have risen during the period of review more quickly than

raw material costs. *See Staff Report* at Table III-6; Table V-1; Table III-2. The ITC cites no

evidence demonstrating that the plant closures are indicative of overall industry vulnerability,

especially as such closures appear to have increased the efficiency and profitability of the

industry as a whole.

To bolster its likely impact analysis, the ITC also concluded that the domestic industry's

sales, production, market share, and capacity fell, and that the industry operated at lower rates of

capacity utilization in 2004 than 1999. *Second Review* at 25-26. However, data for the domestic

industry's sales, production capacity, and capacity utilization rates do not substantiate these

conclusions. *See Staff Report* at Table I-1, Table III-6. For example, when the ITC examined the

industry's capacity utilization rates, it referenced only the data points for 1999 and 2004, which

support its conclusion, but ignored the rates for all other years, which when examined together reveal no discernible trend. The ITC's conclusory findings lack evidentiary support. The ITC must look at the evidence as a whole and not draw conclusions from isolated points of data while ignoring the context of the industry's business cycle. *See* § 1675a(a)(4); *USX Corp. v. United States*, 11 CIT 82, 84, 655 F. Supp. 487, 489 (1987); *see also Atl. Sugar, Ltd.*, 744 F.2d at 1562 (holding that agency must consider entire record as a whole).[22]

The court therefore finds the ITC's conclusion that revocation of the orders would render the domestic industry vulnerable to material injury devoid of the legally required explanation to support its finding and remands the issue to the ITC for elaboration.

## VII. Conclusion

For the reasons discussed above, it is hereby

ORDERED that Plaintiffs' motion for judgment on the agency record is granted in part and denied in part and that the case is REMANDED to the International Trade Commission for further proceedings not inconsistent with this opinion. Specifically, it is

ORDERED that the ITC's finding of an overlap of competition between solid and prilled urea is SUSTAINED; it is further

ORDERED that in its examination of whether the likely volume of subject imports would prove significant if the antidumping orders in question are revoked, the ITC provide more

---

[22]Plaintiffs contend that Chairman Pearson failed to explain how the likely impact on the domestic industry would be adverse if Commerce revokes the orders since he found the domestic industry currently not vulnerable due its high profits and solid returns on investment in 2004. Pls. Mem. 36; *see also Second Review* at 26 n.217. However, Plaintiffs themselves correctly admit that this fact does not preclude an affirmative determination. *See Siderca S.A.I.C.*, 29 CIT at __, 391 F. Supp. 2d at 1369; Pls. Mem. 36.

**Court No. 06-00013**                                                                     **Page 33**

rigorous analysis of its assessment of the effects of third-country barriers; it is further

      ORDERED that the ITC address the deficiencies in its likely price effects argument,

particularly the likely price effects of subject imports in light of the already substantial presence

of low-cost non-subject imports in the domestic market; it is further

      ORDERED that the ITC reassess the likely impact of subject imports on the domestic

industry to account for the difference between the first sunset reviews' findings and the findings

of the current review within the context of the domestic industry's recent improved performance;

and it is further

      ORDERED that the ITC shall have until November 26, 2007 to file its remand results

with the Court.  Plaintiffs and Defendant-Intervenors shall file their respones no later than

December 28, 2007.


      August 28, 2007                                             /s/ Judith M. Barzilay

Dated:_____                      _____
      New York, NY                                                           Judge

# NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

Tina Potuto Kimble
Clerk of the Court

Date: _____     By: _____
                                              Deputy Clerk