Slip Op. 08-64

UNITED STATES COURT OF INTERNATIONAL TRADE

_____
                              :

NEVINNOMYSSKIY AZOT, *et al.*,    :
                              :

        Plaintiffs,              :

                              :

   v.                              :

                              :

UNITED STATES,             :
                              :        Before: Judith M. Barzilay, Judge

        Defendant,         :        Court No. 06-00013

                              :        **Public Version**

    and                      :

                              :

AGRIUM US, INC. & AD HOC     :
COMMITTEE OF DOMESTIC      :
NITROGEN PRODUCERS,       :

                              :

        Defendant-Intervenors.   :
_____:


OPINION

[The Commission's Remand Determination is affirmed.]

Dated: June 9, 2008

*White & Case*, LLP, (*Jay C. Campbell*), (*Scott S. Lincicome*), *Frank H. Morgan*, and *Walter J. Spak* for Plaintiffs.

(*Michael K. Haldenstein*), *Andrea C. Casson*, *James M. Lyons*, and *Neal J. Reynolds*, United States International Trade Commission, Office of the General Counsel, for Defendant United States.

*Joel R. Junker & Associates*, (*Joel R. Junker*); *Akin, Gump, Strauss, Hauer & Feld, LLP*, (*Valerie A. Slater*), *Lisa W. Ross*, and *Margaret C. Marsh* for Defendant-Intervenors.

      **BARZILAY, JUDGE:**  This case concerns the court's remand to the U.S. International

Trade Commission (the "Commission") of its second sunset review determination regarding

solid urea from Russia and Ukraine.  The court affirmed several of the Commission's specific

findings, but remanded to allow the Commission to provide a more reasoned analysis of (1) the

impact of third-country barriers on urea exports, (2) the impact of non-subject imports on

domestic pricing, and (3) certain conditions of competition in the industry.  The Commission

issued its remand determination on November 26, 2007.  *See* Remand Determination of the

Commission in *Nevinnomysskiy Azot v. United States*, Court No. 06-00013 (ITC Nov. 26, 2007)

("*Remand Determination*").  Plaintiffs Nevinnomysskiy Azot, Novomskovsk Azot JSC, JSC

MCC Eurochem, Kuybyshevazot JSC, JSC "Azot" Berezniki, and JSC "Azot" Kemerovo

(collectively "Plaintiffs") challenge the Commission's remand determination, arguing that it is

unsupported by substantial evidence and not in accordance with law.  Agrium US, Inc., and the

Ad Hoc Committee of Domestic Nitrogen Producers appear before the court as Defendant-

Intervenors.  The court finds that substantial evidence supports the Commission's remand

determination and thus affirms.

## I.  Procedural History

In July 1987, after investigating imports of solid urea from the German Democratic

Republic ("GDR"), Romania, and the Union of Soviet Socialist Republics ("USSR"), the

Commission determined that the domestic industry suffered material injury as a result of sales at

less than fair value.[1]  *See Urea From the German Democratic Republic, Romania, and the Union

of Soviet Socialist Republics*, USITC Pub. 1992, Inv. Nos. 731-TA-338-340 (Final) (July 1987)

("*Original Determination*").  Commerce subsequently issued an antidumping duty ("AD") order

---

[1] According to the Commission, solid urea is "a high-nitrogen-content fertilizer that is
produced by reacting ammonia with carbon dioxide" and is sold in both prilled and granular
form.  *Solid Urea From Russia and Ukraine*, Inv. Nos. 731-TA-340 E & H (Second Review),
Pub. 3821 (Dec. 2005), Confidential R. ("CR") 139 at 5.

on imports of solid urea from the GDR, Romania, and the USSR.  *See Antidumping Duty Order; Urea From the Union of Soviet Socialist Republics*, 52 Fed. Reg. 26,367 (Dep't Commerce July 14, 1987); *Antidumping Duty Order; Urea From the Socialist Republic of Romania*, 52 Fed. Reg. 26,367 (Dep't Commerce July 14, 1987); *Antidumping Duty Order; Urea From the German Democratic Republic*, 52 Fed. Reg. 26,366 (Dep't Commerce July 14, 1987).  Following the collapse of the USSR in December 1991, Commerce divided the original AD order into separate orders for each of the fifteen newly independent states.  *See Solid Urea From the Union of Soviet Socialist Republics; Transfer of the Antidumping Duty Order on Solid Urea From the Union of Soviet Socialist Republics to the Commonwealth of Independent States and the Baltic States and Opportunity to Comment*, 57 Fed. Reg. 28,828 (Dep't Commerce June 29, 1992).[2]

In March 1999, the Commission instituted its first sunset reviews of the remaining orders on solid urea pursuant to section 751(c) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1675(c).  *See Solid Urea From Romania, Armenia, Azerbaijan, Belarus, Estonia, Georgia, Kazakhstan, Kyrgyzstan, Latvia, Lithuania, Moldova, Russia, Tajikistan, Turkmenistan, Ukraine, and Uzbekistan*, 64 Fed. Reg. 10,020 (ITC Mar. 1, 1999).  Ultimately, the Commission determined that revocation of any AD order on solid urea imports, except the one pertaining to Armenia, would likely lead to a continuation or recurrence of material injury to the domestic industry within a reasonably foreseeable time.  *See Solid Urea From Armenia, Belarus, Estonia, Lithuania, Romania, Russia, Tajikistan, Turkmenistan, Ukraine, and Uzbekistan*, 64 Fed. Reg.

---

[2] Commerce ultimately revoked the AD order on solid urea from the former GDR in April 1998 because the petitioners in the original investigation expressed no further interest in the order.  *See Solid Urea From the Former German Democratic Republic: Final Results (Revocation of Order) of Changed Circumstances Antidumping Duty Review*, 63 Fed. Reg. 16,471 (Dep't Commerce Apr. 3, 1998).

60,225 (ITC Nov. 4, 1999).  Accordingly, Commerce revoked the AD order on Armenia but left

the others in effect for an additional five years.  *See Revocation of Antidumping Duty Order:*

*Solid Urea from Armenia*, 64 Fed. Reg. 62,654 (Dep't Commerce Nov. 17, 1999); *Continuation*

*of Antidumping Duty Orders: Solid Urea From Belarus, Estonia, Lithuania, Romania, Russia,*

*Tajikistan, Turkmenistan, Ukraine, and Uzbekistan*, 64 Fed. Reg. 62,653 (Dep't Commerce Nov.

17, 1999).

Five years later, the Commission instituted its second sunset reviews of the AD orders.

*See* § 1675(c);  *Solid Urea From Belarus, Estonia, Lithuania, Romania, Russia, Tajikistan,*

*Turkmenistan, Ukraine, and Uzbekistan*, 69 Fed. Reg. 58,957 (ITC Oct. 1, 2004).  Because the

domestic interested parties chose not to participate in the reviews, Commerce revoked all of the

AD orders except those covering Russia and Ukraine.  § 1675(c)(3)(A); *Solid Urea from Belarus,*

*Estonia, Lithuania, Romania, Tajikistan, Turkmenistan, and Uzbekistan: Final Results and*

*Revocation of Orders*, 69 Fed. Reg. 77,993 (Dep't Commerce Dec. 29, 2004).

The Commission issued the final determinations in its second sunset reviews of the

Russian and Ukranian AD orders on December 16, 2005.  *See Solid Urea From Russia and*

*Ukraine*, 70 Fed. Reg. 74,846 (ITC Dec. 16, 2005).  By a three-to-three vote, the Commission

determined that revocation of the AD orders on solid urea from Russia and Ukraine would likely

lead to material injury of the domestic industry within a reasonably foreseeable time.[3]  *Id.*

Therefore, Commerce left the AD orders on Russian and Ukranian urea in effect.  *See Notice of*

---

[3] A tie vote of the Commission is statutorily defined as an affirmative determination by the Commission.  *See* 19 U.S.C. § 1677(11).

*Continuation of Antidumping Duty Orders: Solid Urea from the Russian Federation and*

*Ukraine*, 71 Fed. Reg. 581 (Dep't Commerce Jan. 5, 2006).

Plaintiffs subsequently appealed the Commission's affirmative determination. *See*

*Nevinnomysskiy Azot v. United States*, Slip Op. 07-130, 2007 WL 2563571 (Aug. 28, 2007) (not

reported in F. Supp.) ("*Azot I*"). In *Azot I*, the court affirmed the Commission's findings that: (1)

there was a reasonable amount of competition between granular and prilled urea; (2) the United

States is an attractive market for subject producers because its urea prices are relatively higher

than those in other markets; (3) the subject industries have the ability and incentive to divert their

exports to the United States; and, (4) the global supply of solid urea will expand into a surplus in

the reasonably foreseeable future. *See id.* at *7, 10-12. Finding that the Commission's

determination was "devoid of the legally required explanation to support its finding," the court

remanded the case so that the Commission would: (1) address "whether the likely volume of

subject imports would prove significant if the [AD] orders in question are revoked"; (2) address

the "likely price effects of subject imports in light of the already substantial presence of low-cost

non-subject imports in the domestic market"; and (3) "reassess the likely impact of subject

imports on the domestic industry to account for the difference between the first sunset reviews'

findings and the findings of the current reviews within the context of the domestic industry's

recent improved performance." *Id.* at *16.

The Commission issued its remand determination in November 2007, concluding that

"the domestic industry is vulnerable to the likely adverse impact of the subject imports upon

revocation." *Remand Determination* at 26. In addition, because the Commission also found that

"subject imports are likely to enter the market in significant volumes and at prices that will have

a significant adverse impact on the industry's prices," it determined that "revocation of the orders

would result in the entry of significant quantities of low-priced subject imports into the U.S.

market and that these imports would likely lead to material injury in the industry."  *Id.*  Plaintiffs

now appeal.

## II.  Statutory Background

Every five years following the initial publication of an AD order, Commerce and the

Commission must conduct a sunset review.  *See* § 1675(c).  Following review, Commerce must

revoke the order unless the Commission determines that material injury to the domestic industry

would likely continue or recur.  *See* § 1675(d)(2).  To make a proper determination, the

Commission must "consider the likely volume, price effect, and impact of imports of the subject

merchandise on the [domestic] industry if the order is revoked."  19 U.S.C.  § 1675a(a)(1).  In

addition, the Commission must take into account its prior injury determinations, any

improvements in the state of the industry, vulnerability of the industry to material injury, and

Commerce's duty absorption findings.  *See id*.

The Commission must weigh numerous additional considerations to properly make its

determination.  *See* §1675a(a)(1)-(4).  To evaluate whether the likely volume of subject imports

would be significant, the Commission must consider all relevant economic factors, such as

production capacity, inventories, third-country trade barriers, and manufacturing facilities'

potential for product-shifting.  *See* § 1675a(a)(2).  In determining the likely price effects of

subject imports, the Commission considers whether significant price underselling is likely and

whether import prices would significantly depress or suppress domestic prices.  *See*

§ 1675a(a)(3).  Finally, to evaluate the impact of subject imports, the Commission considers "all

relevant economic factors which are likely to have a bearing on the state of the [domestic]

industry." § 1675a(a)(4).

Although the Commission must weigh all of the aforementioned considerations during

the course of its determination, "no one factor is necessarily dispositive." *Azot I*, 2007 WL

2563571, at *4. Moreover, the presence or absence of any factor "shall not necessarily give

decisive guidance with respect to the Commission's determination of whether material injury is

likely to continue or recur within a reasonably foreseeable time . . . ." § 1675a(a)(5).

### III. Jurisdiction & Standard of Review

This Court has "exclusive jurisdiction" over actions contesting a Commission sunset

review determination, 28 U.S.C. § 1581(c); *see* 19 U.S.C. § 1516a. The Commission assesses

the "likely effect of revocation of the antidumping order on the behavior of the importers" based

on "currently available evidence and on logical assumptions and extrapolations flowing from that

evidence." *Matsushita Elec. Indus. Co., Ltd. v. United States*, 750 F.2d 927, 933 (Fed. Cir.

1984). The court will uphold the Commission's determination unless it is "unsupported by

substantial evidence on the record, or otherwise not in accordance with the law."

§ 1516a(b)(1)(B)(i). Substantial evidence is "more than a mere scintilla. It means such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol.*

*Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938). Crucially, "the possibility of drawing

two inconsistent conclusions from the evidence does not prevent an administrative agency's

finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S.

607, 620 (1966). Because the Commission acts as the expert factfinder, the court will not

"displace [an agency's] choice between two fairly conflicting views, even though the court would

justifiably have made a different choice had the matter been before it *de novo*." *Universal*

*Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951); *see Nippon Steel Corp. v. United States*, 458

F.3d 1345, 1359 (Fed. Cir. 2006)).

## IV.  Discussion

### A.  Effect of Third-Country Barriers on the Likely Volume of Subject Imports

In challenging the *Remand Determination*, Plaintiffs argue that the Commission's likely

volume finding is not supported by substantial evidence because the Commission erred in its

cumulation of the subject imports from Russia and Ukraine and in its analysis of the Chinese

urea embargo.  Pls.' Resp. Br. 3, 6.

Pursuant to court remand, the Commission re-examined the record to determine whether

existing third-country barriers were likely to encourage shifting of subject imports to the U.S.

market.  *See Remand Determination* at 7.  The Commission found that the European Union

("EU") order on Russian urea and the Mexican order on Ukranian urea, are "unlikely to cause a

significant shift of subject imports away from those markets to the United States."  *Id.* at 7.

Specifically, in evaluating the EU's 1995 AD order on Russian urea, the Commission noted that

despite an initial diversion of subject merchandise to other markets, exports of Russian urea to

the EU have increased rapidly in recent years due to strengthening European prices.  *See id.* at 7-

8; *Staff Report to the Commission on Investigation Nos. 731-TA-340-E and H (Second Review):*

*Solid Urea from Russia and Ukraine*, CR 134 at IV-10.  Although the order would once again

restrict Russian exports if prices fell below the set minimum, the Commission noted that prices

"would have to fall *considerably* in the EU for Russian urea again to be hindered by the

minimum pricing provision of the measure."  *Remand Determination* at 8 (emphasis added).  The

Commission therefore found that the order "has not caused the subject Russian producers to shift significant volumes of urea away from the EU market and that it is unlikely to do so in the reasonably foreseeable future." *Id.* at 8.  Similarly, based on a [[      ]] metric ton increase in imports of subject merchandise to Mexico between 2003 and 2004, the Commission concluded that the "Mexican order has not caused the Ukranian producers to shift significant volumes of urea away from the Mexican market [since the imposition of the AD order in 2003]" and is not likely do so in the reasonably foreseeable future.  *Id.* at 8; *see Ad Hoc Committee Pre-Hearing Brief to the* [*Commission*], CR 113 Ex. 2 at 22.

In contrast, the Commission found that the Chinese restriction on urea and the EU order on Ukranian urea "are likely to continue diverting shipments of subject urea to other markets, such as the United States, in the reasonably foreseeable future."  *Remand Determination* at 7. The Commission cited record evidence that China was the largest export market for both Russian and Ukranian urea before it imposed a "virtual embargo" on urea imports in 1998.  *Id.* at 8; *see* CR 134 at IV-10, IV-12.  As a result, exporters "shift[ed] significant volumes of urea away from the Chinese market to other export markets," causing Russian and Ukranian urea imports to drop from over 4 million metric tons in 1996 to 5,000 metric tons in 1999.[4]  *Remand Determination* at 9; CR 113 Ex. 2 at 9, 22.  Given the export pattern data, the Commission inferred that the loss of China as an export market "was a significant factor in the substantial and rapid growth of exports of Russian and Ukranian urea to such markets as the EU and Latin America . . . ."  *Remand Determination* at 9.  Accordingly, the Commission concluded that the Chinese embargo would

---

[4] Although Ukraine exported [[                    ]] metric tons of urea into China in 2001 and 2002, export levels once again fell to [[   ]] in 2003 and 2004.  CR 113 Ex. 2 at 22. Russia fared similarly, with a peak of [[      ]] metric tons in 2002.  *Id.* at 9.

likely continue shifting urea exports towards other markets within the reasonably foreseeable future.  *Id.*  Likewise, the Commission also found that the EU order on Ukranian urea caused producers to shift significant volumes of urea to other markets.  *Id*.  After the EU imposed its AD order on Ukranian urea in 2002, imports dropped [[    ]] percent between 2001 and 2004 to [[        ]] metric tons.  *Confidential Remand Determination* at 10.  During that same period, Ukranian exports to Latin America grew from [[         ]] metric tons in 2001 to [[        ]] metric tons in 2004 – approximately [[   ]] percent.[5]  CR 113 Ex. 2 at 22.  As a result of these trends, the Commission found that the EU order on Ukranian urea "caused the Ukranian producers to shift their urea shipments away from the EU and to other markets, such as Latin America" and that it would likely continue to do so within the reasonably foreseeable future.  *Remand Determination* at 10.

Based on its analysis of third-country barriers, its affirmative findings on the foreign industry's excess capacity levels, the large size and export-oriented nature of the subject producers, the attractiveness of the U.S. market, and the likelihood of global oversupply, the Commission ultimately determined that the likely volume of subject imports would be significant if the AD orders were revoked.  *Remand Determination* at 10-12;  *Azot I*, 2007 WL 2563571, at *10-12.

### 1. Cumulation of Subject Imports

Plaintiffs seek a remand of the Commission's cumulation decision, arguing that the Commission failed to consider whether cumulation of the subject imports remained appropriate

---

[5] Record evidence shows even greater increases in exports of Ukranian urea to [[      ]] between 2001 and 2004.  CR 113 Ex. 2 at 21-22.

in light of its more rigorous analysis of third-country barriers.  Pls.' Resp. Br. 3-6.  Pursuant to

§ 1675a(a)(7), the Commission "may cumulatively assess the volume and effect of imports of the

subject merchandise from all countries [whose sunset reviews] were initiated on the same day, if

such imports would be likely to compete with each other and with domestic like products in the

Unites States market."[6]  § 1675a(a)(7).  However, the Commission will not cumulatively assess

the volume and effects of the subject imports where it "determines that such imports are likely to

have no discernible adverse impact on the domestic industry."  *Id.*  To determine whether imports

are likely to have a discernible adverse impact if the AD orders were revoked, the Commission

considers the likely volume of the subject imports, as well as their impact on the domestic

industry, within a reasonably foreseeable time.  *See* CR 139 at 8.

      On remand, noting that Plaintiffs did not challenge its decision to cumulate the subject

imports for the sunset analysis, the Commission explicitly adopted its prior views on cumulation.

*See Remand Determination* at 5.  In its second sunset determination, the Commission exercised

its discretion and cumulated the likely volume and price effects of subject imports from Russia

and Ukraine because it found: (a) that the subject imports would have a discernible adverse

impact on the domestic industry if the orders were revoked; (b) a likely reasonable overlap of the

competition between the subject imports and the domestic like product if the orders were

---

[6] To determine whether imports compete with each other and with the domestic like
product, the Commission considers four factors: (1) degree of fungibility, (2) presence of sales or
offers to sell in the same geographic markets, (3) existence of common or similar channels of
distribution, and (4) whether there is a simultaneous presence in the market.  *See* CR 139 at 8
n.45.  The Commission need not find completely overlapping markets for imports to compete
with each other and the domestic product as only a "reasonable overlap" of competition is
required to cumulate imports.  *Id.* at 8 & n.46 (citing *Mukand Ltd. v. United States*, 20 CIT 903,
909, 937 F. Supp. 910, 916 (1996).

revoked; and (c) no significant differences in the conditions of competition for subject imports

from Russia and Ukraine.[7]  CR 139 at 9.

   Plaintiffs contend that decumulation is warranted because the Commission changed its

finding on the likely effects of the EU order on Russian urea.  Pls.' Resp. Br. 4-5.  The record

evidence, however, indicates otherwise.  *See* CR 139 at 20-21; *Remand Determination* at 7-8.  In

its original determination, the Commission evaluated the EU orders on Russian and Ukranian

urea and found that "*only the measures on imports from Ukraine have a restraining effect*,

leading to a decline of exports from Ukraine to the [EU] of almost 90 percent from 2003-2004

while Russian exports to the European Union increased rapidly."  CR 139 at 20-21 (emphasis

added).  On remand, the Commission similarly found that "imports of urea from Russia into the

EU have grown rapidly since 2000," and that the EU order on Russian urea "has not caused

subject Russian producers to shift volumes of urea away from the EU market . . . ."  *Remand

Determination* at 7-8.  As the Commission's original conclusions are consistent with its later

determination on the likely effects of the EU order on Russian urea, the court holds that

decumulation is not warranted.

   Plaintiffs also claim that the Commission should have decumulated the subject imports

because the effects of the EU orders on Russian and Ukranian urea result in competition

differences within the U.S. market.  Pls.' Resp. Br. 4; *see* § 1675a(a)(7).  To support their

argument, Plaintiffs cite a determination in which the existence of different third-country

measures was one factor which led the Commission to find that subject imports are likely to

---

   [7] The reviews met the same-day requirement, as they were all initiated on October 1,
2004.  CR 139 at 8.

compete differently in the U.S. market.  Pls.' Resp. Br. 4 (citing *Stainless Steel Wire Rod from*

*Brazil, France, India, and Spain*, Inv. Nos. 701-TA-178 and 731-TA-636-638 (Review), Pub.

No. 3321 (July 2000) at 14 ("*SSWR*").  In *SSWR*, the Commission found "significantly different

conditions of competition for French [stainless steel wire rod] relative to imports from Brazil and

India," and accordingly, elected not to cumulate Brazilian and Indian imports with those from

France.  *SSWR* at 14.  Although the Commission considered third-country measures during its

competition analysis, it also evaluated numerous other factors that contributed to the

Commission's decision, such as length of time and consistency of presence in the U.S. market,

ability to maintain a presence in the U.S. market in spite of an antidumping order, ability to sell

through U.S. subsidiaries, and average unit values.  *Id.*  The number of elements considered by

the Commission in *SSWR* stands in sharp contrast to the present case, where Plaintiffs base their

remand request on a single factor, *i.e.*, different third-country measures.  That the record in this

case contains evidence of one factor among many does not necessitate a remand of the

cumulation decision.

　　　　Moreover, that the Commission found a likelihood of a reasonable overlap of competition

in spite of the differing effects of the EU orders indicates there is little support for Plaintiffs'

claim of competition differences.  *See* CR 139 at 11-13, 20-21.  Following agency practice, the

Commission duly addressed each of the four factors used in its competition analysis.  *See id.* at 8

n.45.  First, the Commission found that subject imports and domestic like product are

"sufficiently fungible for there be a reasonable overlap of competition" because some of the

subject imports would be used as fertilizer and because one-quarter of domestic production is

prilled urea.  *Id*. at 12.  The remaining three factors, *i.e.*, geographic overlap, channels of

distribution, and simultaneous presence, were difficult to evaluate because the subject

merchandise has been absent from the U.S. market since 1987.  *Id.*  Nevertheless, the

Commission found a reasonable overlap of competition based on record evidence that: (a)

international trading companies would likely sell solid urea from the subject countries to U.S.

importers if the orders were revoked, (b) domestic and imported urea were "directed to the same

customers and were frequently commingled in wholesalers' warehouses," and (c) "urea from

both subject countries is marketed by the same international trading companies."  *Id.* at 12-13.

The Commission also took other factors into consideration, including the subject industries'

export oriented nature, similar export markets, and high rates of capacity utilization.  *Id.*  In light

of the evidence cited by the Commission, the court finds that substantial evidence supports the

decision to cumulate the subject imports.

### 2. Likely Volume of Subject Imports

Plaintiffs also challenge the affirmative volume determination by arguing that the

Commission erred in its analysis of the Chinese urea embargo.  Pls.' Resp. Br. 6-7.  Specifically,

Plaintiffs contend that record evidence of operation at almost [[     ]] capacity shows that the

Russian and Ukranian industries had adjusted to the effects of the Chinese urea embargo and

would be unlikely to shift exports into the United States.[8]  Pls.' Resp. Br. 7.  In its *Remand*

*Determination*, the Commission found that "China's decision to restrict urea imports is likely to

continue causing the subject producers to ship their production to *other markets* within the

---

[8] The record indicates that between 1999 and 2004, the Russian industry's capacity
utilization increased from [[          ]] and shipments to all markets increased by [[     ]].
Pls.' Resp. Br. 6-7; CR 134 at IV-9.  The record also indicates that capacity utilization in Ukraine
increased from [[              ]], and total shipments increased by [[       ]] during the same
period.  CR 134 at IV-14.

reasonably foreseeable future." *Remand Determination* at 9 (emphasis added).  The plain

meaning of the language demonstrates the Commission did not conclude that the Chinese

measure would encourage subject producers to shift exports to the United States.  Rather, the

Commission found that subject producers will ship to other markets because they are unlikely to

gain access to the Chinese market in the foreseeable future.  *See Remand Determination* at 9.

That the data implies subject producers have been able to adapt to the closing of China as an

export market does not preclude the Commission from concluding that subject producers must

search for export markets other than China.  Indeed, the Commission's conclusion is supported

by evidence that the Chinese embargo was a "significant factor in the substantial and rapid

growth" of exports to the EU and Latin America, and that the "subject industries have the ability

to divert rapidly a significant volume of their exports from foreign markets to the domestic

market if Commerce revokes the orders." *Id.* at 9; *see* CR 113 Ex. 2, at 8-10, 21-22; *Azot I*, 2007

WL 2563571, at *10 n.15.  Thus, because the Commission's conclusion is consistent with the

data and is supported by the record, the court finds that the Commission properly cumulated the

subject imports and properly evaluated the effects of the Chinese urea embargo.

**B. Likely Price Effects**

        Finding that the Commission failed to explain why subject imports would likely depress

U.S. urea prices when non-subject imports have not affected domestic prices, the court ordered

the Commission to explain "why the elimination of the subject imports would benefit the

domestic industry instead of resulting in the non-subject imports' replacement of the subject

imports' market share without any beneficial impact on domestic producers." *Azot I*, 2007 WL

2563571, at *14-15.  On remand, the Commission considered the record evidence and ultimately

concluded that the "subject imports are likely to enter the United States and have significant adverse effects on domestic prices if the orders are revoked." *Remand Determination* at 14. The Commission offered the following reasons for its finding: (1) "fundamental economics" predicts that significant volumes of low-priced Russian and Ukranian urea would likely place additional pricing pressure on all domestic and non-subject suppliers currently in the market; (2) the subject imports are likely to significantly undersell both the domestic like product and non-subject imports; (3) the record does not establish that the non-subject imports were significantly lower-priced than the domestic like product during the period of review; and (4) the lack of observable price effects from the non-subject imports is due, in part, to domestic producers importing a significant share of non-subject imports into the United States. *See id.* at 14-16.

### 1. Fundamental Economic Principles

Plaintiffs challenge the Commission's reliance on "fundamental economic principles," arguing that non-subject imports are likely to exit the U.S. market swiftly in the face of additional competition, rather than continuing to enter at a constant rate. Pls.' Resp. Br. 8-9. This argument, however, mischaracterizes the record evidence. Although the record indicates that non-subject imports have the *ability* to leave the United States and seek alternative markets, it does not show that they are *likely* to leave. Furthermore, even if non-subject imports were likely to leave the United States market, their exit does not preclude the subject merchandise from exerting downward pressure on domestic prices.[9] Because the Commission "has the discretion to

---

[9] In its second sunset determination the Commission noted that "only a relatively small portion of domestic shipments are insulated from import competition." CR 139 at 21 n.172. That subject imports may undersell and displace non-subject imports does not preclude displacement of domestic urea, given the likelihood that importers like [[                    ]], which already market non-subject imports in the United States, will import and sell subject imports. *See id.*

make reasonable interpretations of the evidence and to determine the overall significance of any

particular factor in its analysis," the court finds that the Commission's finding is consistent with

the record evidence. *Goss Graphic Sys., Inc. v. United States*, 22 CIT 983, 1004, 33 F. Supp. 2d

1082, 1100 (1998) (citing *Me. Potato Council v. United States*, 9 CIT 293, 300, 613 F. Supp.

1237, 1244 (1985)).

### 2. Freight Costs

Plaintiffs also argue that in finding a likelihood of aggressive underselling, the

Commission unreasonably relied on price comparisons that did not account for variations in

freight costs. Pls.' Resp. Br. 9-11. The Commission found that "the record evidence, viewed as

a whole, indicates that the subject imports are likely to significantly undersell both the domestic

like product and non-subject imports." *Remand Determination* at 14 (footnote omitted); *see Azot*

*I*, 2007 WL 2563571, at *13. According to the [[          ]] September 2005 study, there was a

$28 to $45 per ton price differential between bulk prilled urea sold on a free on board ("f.o.b.")

basis at Black Sea and Middle Eastern ports. *See Remand Determination* at 15; *see also Ad Hoc*

*Committee Oct. 26, 2005 Submission of Additional Information to the* [*Commission*], CR 132

Attach. 1 at 9; CR 113 Ex. 22. The same study also showed that in 2004, prices for Russian and

Ukranian urea were lower than urea from non-subject countries when entering third-country

markets like Brazil, Canada, and Columbia. *Remand Determination* at 15 & n.52; *see* CR 113

Ex. 27.

According to Plaintiffs, the f.o.b. prices "had no probative value for assessing the

delivered transaction price" because "when the difference in the freight rates [to Asia] is

accounted for, there is [[                    ]] between the [Black Sea] price and the Middle

East price for prilled urea." Pls.' Confidential Resp. Br. 10 (second bracket in original).  The

court finds this argument unavailing for several reasons.  First, as the Commission noted,

Plaintiffs do not cite any evidence "supporting their assertion that freight costs from the Black

Sea to Asian markets are *consistently and significantly* higher than the costs for shipment from

Middle Eastern ports . . . ."  *Remand Determination* at 15 n.52 (emphasis added).  Second,

Plaintiffs' claim ignores record evidence that [[


]].  *See* CR 113 Ex. 2 at 23.  Third, Plaintiffs fail to acknowledge that

pricing merchandise to compensate for expenses incurred in a [[        ]] percentage of their

exports grants them an advantage vis-a-vis other producers when shipping to markets where there

is little or no freight disadvantage.  *See* CR 113 Ex. 7 at 2.  Although Russia and Ukraine have a

[[

]], these two markets constitute less than [[  ]] percent of total Russian

and Ukranian exports in 2004.[10]  *See* CR 113 Ex. 2 at 9-10, 22.  In contrast, there is no evidence

that subject producers experience the same sort of freight cost disadvantages in Latin America, a

market that purchases [[   ]] percent of Russian urea exports and [[   ]] percent of Ukranian urea

exports.[11]  *See* CR 113 Ex. 2 at 9-10, 22.  Rather, the record shows "consistent pricing

differentials between the subject merchandise and other countries' exports" to Canada, Colombia

_____

[10] In 2004, subject producers in Russia and Ukraine exported [[              ]] metric tons
of urea, but shipped only [[          ]] metric tons to Asia and [[     ]] metric tons to Oceania,
*i.e.,* less than [[  ]] percent of their total exports.  CR 113 Ex. 2 at 9-10, 22.

[11] Although a "[[
                                                ]]," f.o.b. prices at Baltic Sea ports were even lower than
those at Yuzhnyy in 2005.  CR 113 Ex. 2 at 10 & Ex. 7.

and Brazil, markets which "reflect freight and transport charges at comparable levels."[12] *Remand*

*Determination* at 15 n.52; CR 113 Ex. 27.  Fourth, the court agrees with the Commission that "if

the subject producers are pricing their products at lower prices to offset transportation costs to

Asian markets, this indicates that they are willing to compete aggressively on price to compete

with other suppliers in export markets." *Remand Determination* at 15 n.52.

Given that freight differentials to [[    ]] export markets do not explain a low f.o.b. price

for urea that subject producers ship predominantly to markets other than Asia and Oceania, and

given that "the Commission, as the trier of fact, has considerable discretion in weighing the

probative value and relevance of evidence," the court finds that the Commission reasonably

relied on Black Sea f.o.b. prices as an indication that subject imports were likely to undersell

both domestic and non-subject urea.  *Mukand Ltd.*, 20 CIT at 906, 937 F. Supp. at 914.

### 3. The Commission's Reliance on Average Unit Values

Plaintiffs contend that the Commission unreasonably relied on average unit value

information that was flawed and of limited probative value.[13]  Pls.' Resp. Br. 11-13.  The court

does not agree.  The Commission is well aware of the potential pitfalls posed by average unit

values and determines whether it may reasonably use the average unit value data for its likely

---

[12] Russian and Ukranian urea compete against [[

]].  *See* CR 132 Attach. 1 at 77-88.
During 2004, the last year in the period of review, non-subject and subject urea imports differed
by [[   ]] per metric ton in Brazil (f.o.b.), [[    ]] per metric ton in Colombia (c.i.f.), and [[      ]]
per metric ton in Canada (f.o.b).  CR 113 Ex. 27; *see Remand Determination* at 15.

[13] "[Average unit values] are computed by multiplying, for each product, the price of the
product times the quantity sold, summing these results, and then dividing the total by the total
number of products sold." *U.S. Steel Group v. United States*, 96 F.3d 1352, 1364 (Fed. Cir.
1996).

price determination on a case by case basis.[14]   Indeed, the Commission has stated that it "views

[average unit values] with caution when comparing prices of the domestic like product and

subject imports" because "the product mix in the two groups may differ" and "[average unit

values] may not reflect an accurate price comparison for a particular product." *Greenhouse

Tomatoes from Canada*, USITC Pub. 3424, Inv. No. 731-TA-925 (Preliminary), at 9 n.57 (May

2001) ("*Greenhouse Tomatoes*").   Accordingly, where there are differences in product mix or

average unit values represent a wide variety of transactions for many locations by several

importers, the Commission does not utilize average unit values as an indicator of price

comparisons.   *See Urea Ammonium Nitrate Solutions From Belarus, Russia, and Ukraine*,

USITC Pub. 3591, Inv. Nos. 731-TA-1006, 1008, and 1009 (Final), at 18 n.106 (Apr. 2003);

*Oleoresin Paprika From India*, USITC Pub. 3415, Inv. No. 731-TA-923 (Preliminary), at 11

n.63 (Apr. 2001).   Where product mix is *not an issue*, the Commission finds that average unit

values reflect differences in average price.   *See Hot-Rolled Steel Products From Argentina,

China, India, Indonesia, Kazakhstan, Romania, South Africa, Taiwan, Thailand, and Ukraine*,

USITC Pub. 3956, Inv. Nos. 701-TA-404-408 & 731-TA-898-902 & 904-908 (Review), at 37 &

n.209 (Oct. 2007); *Silicon Metal From Russia*, USITC Pub. 3910, Inv. No. 731-TA-991 (Final)

(Second Remand), at 13 n.69 (Mar. 2007); *Certain Polyester Staple Fiber From China*, USITC

Pub. 3922, Inv. Nos. 731-TA-1104 (Final), at 17, 32-33 & n.210 (June 2007); *Greenhouse

Tomatoes* at 9 n.57.

---

[14] Recognizing that "the Commission must assimilate and interpret large quantities of data" in making its determinations, the Federal Circuit has declined to "hold, as a general rule, that the Commission may not rely on [average unit value] trends as indicative of corresponding changes in price." *U.S. Steel Group*, 96 F.3d at 1364.

In this case, Plaintiffs provided no record evidence to support their claim that "in this context, average unit values can mask differences in product mix, making it impossible to conduct an apples-to-apples comparison."  Pls.' Resp. Br. 11.  Furthermore, the Commission found that prices for both forms of urea, *i.e.*, prilled and granular, are similar and that the two forms are moderately substitutable.  *See* CR 139 at 16, 22.

The court is not persuaded by Plaintiffs's claim that the Commission misunderstood the data comparing f.o.b. prices for shipments of non-subject and subject urea to Canada and Brazil. Pls.' Resp. Br. 12.  The Commission explicitly noted that imports into Brazil and Canada were priced on an f.o.b. basis, while Colombian prices were on a c.i.f. (*i.e.*, cost, insurance, and freight) basis.  *Remand Determination* at 15 n.52.  Moreover, that the Commission stated the prices "reflect freight and transportation charges at comparable levels" does not suggest that the data included the same types of freight, but rather, that the pricing data for each particular country is reported on the same basis.  *Id.*

Although Plaintiffs also seek to discredit the  Brazilian, Canadian, and Colombian price comparisons because the differences in all but five of the twenty-one comparisons is below $20 per ton,  Pls.' Resp. Br. 13, the record is replete with evidence that price differences of this magnitude are significant.  *See* CR 139 at 22-23 (stating that "price is an important consideration in purchasing decisions and the record indicates that consumers will consider switching to prilled urea for use as a fertilizer given a sufficient discount."); [[                           ]] *Questionnaire Response to the* [*Commission*], CR 28 at 11 [[

                                                              ]]; [[

       ]] *Questionnaire Response to the* [*Commission*], CR 68 at 11 [[

]]; [[                                                ]]

*Questionnaire Response to the* [*Commission*], CR 46 at 11 [[

]].

Because it is within the Commission's discretion "to assess the probative nature of the

evidence obtained in its investigation and to determine whether to discount the evidence or to

rely on it," the court holds that the Commission reasonably relied on the average unit value data

to analyze the likely price effects of the subject imports. *See Goss Graphic Sys., Inc.*, 22 CIT at

1002, 33 F. Supp. 2d at 1099.

### 4. *Effect of Non-subject Imports on Domestic Urea Prices*

On remand the Commission found the record did not reflect that "non-subject imports

were significantly lower-priced than the domestic like product during the period of review . . . ."

*Remand Determination* at 16.  Using its own pricing data as well as prices reported in the

industry publication *Green Markets*, the Commission compared the prices of both types of urea

at the Gulf Coast during the period of review. *Id.*  While non-subject prices were "somewhat

lower" than domestic prices at the Gulf Coast, "the pricing differential was small." *Id.*  The

Commission then attributed this small and insignificant price differential to the fact that domestic

producers import a "large and significant" share of non-subject imports into the United States

market. *Id.*  Therefore,

> [g]iven that domestic producers imported a large share of the non-subject imports
> into the U.S. market at the end of the period of review, it is hardly surprising that
> the non-subject imports were priced at levels that did not adversely affect
> domestic pricing during the period of review.

*Id.*

Referring to data showing that domestic producers imported [[          ]], or [[     ]] percent, of the [[          ]] short tons of urea shipped into the United States in 2004, Plaintiffs claim that the Commission's finding cannot be sustained because it relied on inaccurate data regarding the percentage of imports attributable to domestic producers.  Pls.' Confidential Resp. Br. 14 (citing CR 134 at I-40, Table I-6 & App. C Table C-2).  The court, however, will not be persuaded by Plaintiffs' attempts to discredit information contained in its own submission, which stated that "[i]n 2004 domestic producers accounted for over [[     ]] of *reported* urea imports." *Pls.' Remand Proceeding Comments*, CR 145R at 10 (emphasis added); *Remand Determination* at 16; CR 134 at I-42, Table I-7.[15]  Because "[t]his Court lacks authority to interfere with the Commission's discretion as trier of fact to interpret reasonably evidence collected in the investigation," and because the Commission reasonably interpreted the data reported by U.S. importers, the court finds that substantial evidence supports the Commission's finding.[16]  *Acciai Speciali Terni S.p.A. v. United States*, 28 CIT 2013, 2030, 350 F. Supp. 2d 1254, 1269 (2004).

### 5. *Average Unit Values of FSU Imports*

As a corollary to the adverse effect finding, the Commission noted that imports from former Soviet Union ("FSU") countries were priced lower than domestic urea after revocation of

---

[15] The Commission solicited information from [[          ]] firms, and used data from the [[          ]] questionnaire responses it received to compile Table I-7.  *See* CR 134 at I-41.  The [[          ]] firms that responded account for [[     ]] percent of total United States imports and include five domestic producers  – [[                                                  ]].  *Id.*; *see* CR 134 at I-40, Table I-6.

[16] Even if the Commission were to find instead that domestic producers' imports accounted for only [[     ]] percent of total imports in 2004, it would nonetheless be reasonable for the Commission to find that "a large and significant share" of non-subject imports were imported into the United States given that said imports would constitute over [[          ]] of total imports.  *See* CR 134 at I-40, Table I-6 & App. C Table C-2.

the AD orders.  *Remand Determination* at 16 n.56.  Accordingly, the Commission concluded that

"[t]he behavior of the trading companies in selling this prilled urea from Black Sea ports is

indicative of the manner in which the subject urea would be sold if the orders were revoked

because it is most comparable to solid urea from Russia and Ukraine."  *Id.* at 16-17 n.56.

Plaintiffs contend that because "average unit values suffer from many shortcomings that render

them unreliable indicators of price," the Commission unreasonably found that average unit

values of FSU imports are indicative of likely subject import prices.  Pls.' Resp. Br. 15.  As

discussed earlier, so long as there are no issues of product mix, the Commission is well within its

discretion to reasonably rely on average unit values when making its determination.  *See Goss*

*Graphic Sys., Inc.*, 22 CIT at 1002, 33 F. Supp. 2d at 1099.  Therefore, this argument fails.

According to Plaintiffs, the record contained information showing that the "actual U.S.

market transaction price of FSU urea . . . [was] the same as U.S. producer's price" in September

2005.  Pls.' Resp. Br. 15.  However, Plaintiffs misconstrue the data.  In its entirety, the record

states that the "[i]mported product has sold at $305 [per short] ton Tampa, while PCS is at $305

[per short] ton Augusta."  Pls.' Confidential Resp. Br. Attach. 13.  The plain meaning of the

language shows that the price quote does not specify the origin of the imported urea.[17]  Moreover,

it is unclear whether this particular data represents an apples-to-apples comparison, as the

evidence provides neither an f.o.b. price nor any indication of freight costs needed to ship the

imports to Tampa or Augusta.[18]  Pls.' Resp. Br. Attach. 13.  Even if the import and PCS prices

---

[17] The same report specifically refers to FSU urea by using phrases such as "FSU prices,"
"[[                          ]]," and "FSU material."  Pls.' Confidential Resp. Br. Attach. 13.

[18] Crucially, other evidence in the record indicates that the *f.o.b.* price of FSU urea during
the third quarter of 2005 was between [[                          ]] per ton.  CR 132 Attach. 1 at 104.

were appropriate for comparison, other evidence in the record contradicts Plaintiffs' claim.  For

example, the [[          ]] study shows that the price of FSU urea during 2005 was [[

]] than urea from the Middle East, the United States, and the Carribean.  CR 132 Attach. 1

at 104.  Indeed, FSU urea undersold the domestic product by an average of [[     ]] percent.  *See*

CR 113 at 47 & Ex. 23.  Given the unclear nature of the prices cited by Plaintiffs, the

Commission reasonably relied on the other record evidence in concluding that FSU urea was

priced lower than domestic urea.

### C. Likely Impact on the Domestic Industry

Upon review of the Commission's second sunset determination, the court held that the

Commission failed to explain how it could find that high natural gas prices have weakened the

domestic industry despite record evidence of increased profits and rising domestic urea prices.

*See Azot I*, 2007 WL 2563571, at *15.  In addition, because the court found that the data on sales,

production, market share, production capacity, and capacity utilization revealed no particular

trend, the Commission could not reasonably conclude that the industry would be vulnerable to

material injury.  *See id*. at *16.  On remand, the court instructed the Commission to "reassess the

likely impact of subject imports on the domestic industry to account for the difference between

the first sunset reviews' findings and the findings of the current review within the context of the

domestic industry's recent improved performance."  *Id.* at *16.

Following its reexamination of the record, the Commission found that the "industry is

vulnerable to the likely adverse impact of the subject imports upon revocation of the orders."

*Remand Determination* at 18.  Although various indicators of the industry's condition showed

fluctuation and improvement during the period of review,[19] the Commission also found that "the

industry experienced serious declines in other indicia of its condition over the period of review."

*Remand Determination* at 19.  Specifically, the industry lost 15.6 percent of its market share over

the period of review, "falling from a majority position of 51.5 percent in 1999 to a minority

position of 36.0 percent in 2004."  *Id.*  Between 2001 and 2004, industry capacity also declined

significantly, falling 12 percent to 4.8 million tons.  *Id.*  Between 1999 and 2004, capacity

utilization declined from 92.2 percent to 78.8 percent.  *Id.*  Other industry indicators show similar

declines: shipment quantities fell by 19.8 percent during the period of review, workforce

employment fell by 29.2 percent, hours worked fell by 30.5 percent and total wages fell by 13.3

percent.  *Id.* (citing CR 134 at I-7, Table I-1 & App. C. Table C-1).  The Commission noted that

the domestic industry "was suffering further cutbacks in its production and capacity levels" as a

result of natural gas supply shortages, spikes in natural gas pricing, plant closures, and

inadequate demand.  *Id.* at 20; *see* CR 134 at III-4-III-5.  The Commission also acknowledged

that "although the industry's average unit prices and sales revenues increased considerably over

the period of review, these increases were offset to some degree by considerable, but smaller,

increases in the industry's cost of goods sold, and selling, general and administrative expenses."

*Remand Determination* at 20; *see* CR 134 at I-7, Table I-1.  Based on the record evidence, the

Commission determined that "the industry's position in the market has weakened to such an

---

[19] The record showed that the industry's operating income margins improved to profits of [[    ]] percent and [[    ]] percent in 2003 and 2004, productivity rates increased from [[    ]] short tons in 1999 to [[    ]] short tons in 2004, and average unit prices and net sales revenues improved considerably over the period of review.  *Remand Determination* at 18-19; *see* CR 134 at I-6-I-7, Table I-1.

extent that it is vulnerable to the likely impact of the subject imports upon revocation." *Remand Determination* at 20.

Plaintiffs argue that the Commission should make its impact determination based solely on the conditions of currently operating domestic producers rather than on data that includes inefficient producers which have exited the business.  Pls.' Resp. Br. 16-17.  According to Plaintiffs, the inclusion of data from Mississippi Chemical Corp. and Terra Industries (which had exited the industry by 2005), to evaluate the "vulnerability or likely impact to the remaining producers distorts the actual performance of the industry, making it look [[      ]] than it actually was."  Pls.' Confidential  Resp. Br. 18.  The court does not agree.

To determine the likelihood of continuation or recurrence of material injury, the Commission must evaluate "whether the *industry* is vulnerable to material injury if the order is revoked or the suspension agreement is terminated."  19 U.S.C. § 1675a(a)(1)(C) (emphasis added).  That the term "industry" means "*producers as a whole* of a domestic like product" indicates that the Commission must evaluate the entire industry and include all of the participating producers.  § 1677(4)(A) (emphasis added).  This Court has also previously found that the Commission must "assess whether the industry 'as a whole' has been injured by the subject imports."  *Cleo Inc. v. United States,* Slip Op. 06-131, 2006 WL 2685080, at *16 (Aug. 31, 2006).

With regard to the likely impact of subject imports, the Commission must consider all relevant economic factors that will affect the condition of the domestic industry.  § 1675a(a)(4).  This analysis does not occur in a vacuum, but rather, "within the context of the business cycle and the conditions of competition that are distinctive to the affected industry."  *Id.*  A clear

picture of market conditions and trends is possible only if the Commission considers all of the

relevant economic data from the period of review.  The fact that domestic producers were forced

to exit the market is itself a condition of competition and an indicator of overall market

conditions.  As a result, "[a]ny vulnerability (or injury) analysis that excludes producers that

exited the industry during the period will necessarily be inaccurate because it ignores those

producers that have been most quickly affected by competitive conditions."[20]  Def.-Int.

Comments 17.  Furthermore, exclusion of this data would mask the industry's shrinkage and

obscure declining market share, capacity utilization, and United States shipments.  *See Remand*

*Determination* at 19.[21]  The Commission must therefore evaluate the industry as a whole and

include such data from the participating producers that it finds relevant to its analysis and will act

as substantial evidence for its conclusions.

       Plaintiffs also claim that because the Commission unreasonably relied on witness

testimony, substantial evidence does not support a finding that "the domestic industry was no

longer profitable by the second half of 2005."  Pls.' Resp. Br. 19 (quotations omitted); *see*

*Remand Determination* at 25.  However, because "assessments of the credibility of witnesses are

within the province of the trier of fact," this Court "lacks authority to interfere with the

Commission's discretion as trier of fact to interpret reasonably evidence collected in the

---

[20] The record evidence shows that the domestic industry has become smaller over the course of the past two decades.  *See Remand Determination* at 23.  During the original investigations, twenty four firms operated in the domestic urea industry, with the number falling to twelve at the end of the first reviews, and seven in 2005.  *See id.*; CR 139 at 17.

[21] Even if the Commission were to exclude the two inefficient firms from the data set, there would be no significant effect on the ratio of operating income/loss to net sales.  *Compare* Pls.' Resp. Br. Attach. 17 (showing [[    ]] percent in 2003 and [[    ]] percent in 2004) *with* CR 134 at I-7, Table I-1 (showing [[    ]] percent in 2003 and [[    ]] percent in 2004).

investigation." *Negev Phosphates, Ltd. v. Dep't of Commerce*, 12 CIT 1074, 1092, 699 F. Supp.

938, 953 (1988); *see Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1358-59 (Fed. Cir.

2006); *NMB Sing. Ltd. v. United States*, 27 CIT 1325, 1348-49, 288 F. Supp. 2d 1306, 1326

(2003).  In this case, the Commission cited the duly sworn and unimpeached testimony of three

witnesses who testified to low profit margins in the second half of 2005.  *See* Pls.' Confidential

Resp. Br. Attach. 16 at 128-129.  The Commission, therefore, reasonably relied on the record

evidence to support its finding.  Thus, in light of the significant declines in market indicia, the

court finds that substantial evidence supports the Commission's finding that the domestic

industry is vulnerable to the likely adverse impact of subject imports.

## V. Conclusion

For the foregoing reasons, the court finds that the Commission reasonably relied on the

record evidence and that its analysis is supported by substantial evidence.  Accordingly, the

*Remand Determination* is **AFFIRMED**.


Dated:      June 9, 2008                                    /s/ Judith M. Barzilay
            New York, NY                              Judith M. Barzilay, Judge

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| NEVINNOMYSSKIY AZOT, *et al.*, | : | |
| Plaintiffs, | : | |
| v. | : | |
| UNITED STATES, | : | Before: Judith M. Barzilay, Judge |
| Defendant, | : | Court No. 06-00013 |
| and | : | |
| AGRIUM US, INC. & AD HOC COMMITTEE OF DOMESTIC NITROGEN PRODUCERS, | : | |
| Defendant-Intervenors. | : | |

## JUDGMENT AND ORDER

Upon reading the comments submitted by Nevinnomysskiy Azot, Defendant United States, and Defendant-Intervenors Agrium US, Inc., and the Ad Hoc Committee of Domestic Nitrogen Producers, as well as all other papers filed and proceedings conducted in this civil action, it is hereby:

ORDERED that the Commission's Remand Determination is AFFIRMED.

Dated: June 9, 2008
New York, NY

/S/      Judith M. Barzilay
Judge

## NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

Tina Potuto Kimble
Clerk of the Court

Date: _____       By: _____
                                              Deputy Clerk